JULIE A. DUNNE, Bar No. 160544
E-mail: jdunne@littler.com
LITTLER MENDELSON
A Professional Corporation
501 W. Broadway
Suite 900
San Diego, California 92101-3577
Telephone:   619.232.0441
Fax No.:       619.232.4302

DOMINIC J. MESSIHA, Bar No. 204544
E-mail:  dmessiha@littler.com
AMIR NAYEBDADASH, Bar No. 232204
E-mail:  anayebdadash@littler.com
LITTLER MENDELSON
A Professional Corporation
2049 Century Park East, 5th Floor
Los Angeles, CA  90067.3107
Telephone:  310.553.0308
Facsimile:   310.553.5583

Attorneys for Defendants
CEVA LOGISTICS U.S., INC., CEVA FREIGHT
MANAGEMENT INTERNATIONAL GROUP,
INC., CEVA FREIGHT, LLC, and EGL EAGLE
GLOBAL LOGISTICS, LP

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LONNIE R. SMITH, individually, and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CEVA LOGISTICS U.S., INC.; a Delaware corporation; CEVA FREIGHT MANAGEMENT INTERNATIONAL GROUP, INC., a Delaware corporation; CEVA FREIGHT, LLC, a Delaware limited liability company; EGL EAGLE GLOBAL LOGISTICS, LP, a Delaware limited partnership; and DOES 1 through 200, inclusive,<br><br>Defendants. | Case No.  CV09-4957 CAS (RCx)<br><br>ASSIGNED FOR ALL PURPOSES TO JUDGE CHRISTINA A. SNYDER<br><br>**DEFENDANTS' EVIDENCE PACKET IN SUPPORT OF OPPOSITION TO PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION**<br><br>Date:       July 11, 2011<br>Time:      10:00 a.m.<br>Place:      Courtroom 5 |

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA  90067-3107
310 553 0308

Firmwide:101808700.1 057554.1008

1   TO PLAINTIFF LONNIE R. SMITH AND HIS ATTORNEY OF RECORD:

2        PLEASE TAKE NOTICE that Defendants CEVA LOGISTICS U.S., INC.,

3   CEVA FREIGHT MANAGEMENT INTERNATIONAL GROUP, INC., CEVA

4   FREIGHT, LLC, and EGL EAGLE GLOBAL LOGISTICS, LP, ("Defendants")

5   submit herewith the attached Declarations and Exhibits thereto in support of

6   Defendants' Opposition to Plaintiff's Renewed Motion for Class Certification:

7   1.   <u>Declaration of Dominic Messiha.</u>

8        <u>Documents Attached Thereto</u>:

9         • Exhibit A – Selected excerpts from Philip Gorman, Ph.D.'s, Deposition

10         • Exhibit B – Selected excerpts from Lonnie R. Smith's Deposition

11         • Exhibit C – Selected excerpts from Denise Moore's Deposition.

12         • Exhibit D – Selected excerpts from Ramiro Reyna's Deposition.

13   2.   <u>Declaration of Fidelio Adriano - No Documents Attached Thereto.</u>

14   3.   <u>Declaration of Oscar Avendano - No Documents Attached Thereto.</u>

15   4.   <u>Declaration of Maryester Balo - No Documents Attached Thereto.</u>

16   5.   <u>Declaration of Eric Cassillas - No Documents Attached Thereto.</u>

17   6.   <u>Declaration of Wendy Ceballos - No Documents Attached Thereto.</u>

18   7.   <u>Declaration of Vanessa Cruz - No Documents Attached Thereto.</u>

19   8.   <u>Declaration of  Stephen Alexander Hart - No Documents Attached Thereto.</u>

20   9.   <u>Declaration of Jacquelyn Lowden - No Documents Attached Thereto.</u>

21   10.   <u>Declaration of Lorenzo Molina - No Documents Attached Thereto.</u>

22   11.   <u>Declaration of Eduarado Mora (First) - No Documents Attached Thereto.</u>

23   12.   <u>Declaration of Eduardo Mora (Second) - No Documents Attached Thereto.</u>

24   13.   <u>Declaration of Carlos Mosquera - No Documents Attached Thereto.</u>

25   14.   <u>Declaration of Ashley Pilot - No Documents Attached Thereto.</u>

26   15.   <u>Declaration of Vanessa Ruiz - No Documents Attached Thereto.</u>

27   16.   <u>Declaration of Catherine T. Strohm - No Documents Attached Thereto.</u>

28   17.   <u>Declaration of Mildred Trowbridge (First) - No Documents Attached Thereto.</u>

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067 3107
310 553 0308

Firmwide:101808700.1 057554.1008

1.

18.   Declaration of Mildred Trowbridge (Second) - No Documents Attached Thereto.

19    Declaration of Ruben Vega, Jr. - No Documents Attached Thereto.

20.   Declaration of Ernie Villaverde - No Documents Attached Thereto.

21.   Declaration of Javier Yepez- No Documents Attached Thereto.

22.   Declaration of Ignacio Zuniga - No Documents Attached Thereto.


Dated:   May 20, 2011

                                        /s/
                              JULIE DUNNE
                              DOMINIC J. MESSIHA
                              AMIR NAYEBDADASH
                              LITTLER MENDELSON
                              A Professional Corporation
                              Attorneys for Defendants
                              CEVA LOGISTICS U.S., INC., CEVA
                              FREIGHT MANAGEMENT
                              INTERNATIONAL GROUP, INC.,
                              CEVA FREIGHT, LLC, and EGL
                              EAGLE GLOBAL LOGISTICS, LP

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2049 Century Park East
5th Floor
Los Angeles, CA  90067 3107
310 553 0308

Firmwide:101808700.1 057554.1008

2.

# DECLARATION OF DOMINIC MESSIHA

JULIE A. DUNNE, Bar No. 160544
E-mail: jdunne@littler.com
LITTLER MENDELSON
A Professional Corporation
501 W. Broadway
Suite 900
San Diego, California 92101-3577
Telephone:     619. 232.0441
Fax No.:        619. 232.4302

DOMINIC J. MESSIHA, Bar No. 204544
E-mail:  dmessiha@littler.com
AMIR NAYEBDADASH, Bar No. 232204
E-mail:  anayebdadash@littler.com
LITTLER MENDELSON
A Professional Corporation
2049 Century Park East, 5th Floor
Los Angeles, CA  90067.3107
Telephone:  310.553.0308
Facsimile:  310.553.5583

Attorneys for Defendants
CEVA LOGISTICS U.S., INC., CEVA FREIGHT
MANAGEMENT INTERNATIONAL GROUP,
INC., CEVA FREIGHT, LLC, and EGL EAGLE
GLOBAL LOGISTICS, LP

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LONNIE R. SMITH, individually, and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CEVA LOGISTICS U.S., INC.; a Delaware corporation; CEVA FREIGHT MANAGEMENT INTERNATIONAL GROUP, INC., a Delaware corporation; CEVA FREIGHT, LLC, a Delaware limited liability company; EGL EAGLE GLOBAL LOGISTICS, LP, a Delaware limited partnership; and DOES 1 through 200, inclusive,<br><br>. Defendants. | Case No.  CV09-4957 CAS (RCx)<br><br>ASSIGNED FOR ALL PURPOSES TO JUDGE CHRISTINA A. SNYDER<br><br>**DECLARATION OF DOMINIC J. MESSIHA IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION**<br><br>Hearing Date:     July 11, 2011<br>Time:              10:00 a.m.<br>Place:             Courtroom 5 |

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2045 Century Park East
5th Floor
Los Angeles, CA  90067 3107
310 553 0308

## DECLARATION OF DOMINIC J. MESSIHA

I, DOMINIC J. MESSIHA, hereby declare and state as follows:

1.    I am an attorney at law, licensed to practice in the State of California and before this court.   I am a Shareholder with the law firm of Littler Mendelson, a Professional Corporation, counsel  of record for Defendants.  I make this declaration in support of Defendants' Opposition to Plaintiff's Renewed Motion for Class Certification.  I make this declaration based on personal knowledge and, if called to testify, could and would testify competently thereto.

2.    Attached hereto as Exhibit A is a true and correct copy of selected excerpts from Philip Gorman, Ph.D.'s Deposition taken on May 16, 2010.

3.    Attached hereto as Exhibit B is a true and correct copy of selected excerpts and an exhibit from Lonnie R. Smith's Deposition taken on April 6, 2010.

4.    Attached hereto as Exhibit C is a true and correct copy of selected excerpts from  Denise Moore's Deposition taken on April 7, 2010 .

5.    Attached hereto as Exhibit D is a true and correct copy of selected excerpts from  Ramiro Reyna's Deposition taken on April 8, 2010.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed at Los Angeles, California, this 20th day of May 2011.

/s/
DOMINIC J. MESSIHA

Firmwide:101808802.1 057554.1008

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2049 Century Park East
5th Floor
Los Angeles, CA  90067 3107
310 553 0308

1.

# EXHIBIT A

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

LONNIE R. SMITH, INDIVIDUALLY,   )
AND ON BEHALF OF OTHERS        )
SIMILARLY SITUATED,             )
                               )
       PLAINTIFFS,          )
                               )
   VS.                         )  NO. CV09-4957 CAS
                               )  (RCx)
CEVA LOGISTICS U.S., INC., A     )
DELAWARE CORPORATION; CEVA      )
FREIGHT MANAGEMENT INTERNATIONAL )
GROUP, INC., A DELAWARE         )
CORPORATION; CEVA FREIGHT, LLC., )
A DELAWARE LIMITED LIABILITY    )
COMPANY; EGL EAGLE GLOBAL       )
LOGISTICS, LP, A DELAWARE       )
LIMITED PARTNERSHIP; AND DOES 1  )
THROUGH 200, INCLUSIVE,        )
                               )
       DEFENDANTS.          )
_____)

DEPOSITION OF PHILIP C. GORMAN, Ph.D.

Los Angeles, California

Monday, May 16, 2011

REPORTED BY:

JOHN M. TAXTER
CSR NO. 3579

JOB NO.
66869LMF

```
1                 UNITED STATES DISTRICT COURT

2                 CENTRAL DISTRICT OF CALIFORNIA

3

4   LONNIE R. SMITH, INDIVIDUALLY,      )
    AND ON BEHALF OF OTHERS             )
5   SIMILARLY SITUATED,                 )
                                        )
6           PLAINTIFFS,                 )
                                        )
7       VS.                             )  NO. CV09-4957 CAS
                                        )  (RCx)
8   CEVA LOGISTICS U.S., INC., A        )
    DELAWARE CORPORATION; CEVA          )
9   FREIGHT MANAGEMENT INTERNATIONAL    )
    GROUP, INC., A DELAWARE             )
10  CORPORATION; CEVA FREIGHT, LLC.,    )
    A DELAWARE LIMITED LIABILITY        )
11  COMPANY; EGL EAGLE GLOBAL           )
    LOGISTICS, LP, A DELAWARE           )
12  LIMITED PARTNERSHIP; AND DOES 1     )
    THROUGH 200, INCLUSIVE,             )
13                                      )
            DEFENDANTS.                 )
14  _____   )

15

16          Deposition of PHILIP C. GORMAN, Ph.D.,

17          Witness, taken on behalf of Defendants

18          at 2049 Century Park East, Fifth Floor,

19          Los Angeles, California, commencing at

20          9:58 a.m. on Monday, May 16, 2011,

21          before John M. Taxter, CSR No. 3579,

22          a Certified Shorthand Reporter in and

23          for the County of Los Angeles, State

24          of California.

25
```

```
 1    APPEARANCES:

 2        FOR PLAINTIFFS:

 3            WESTRUP KLICK LLP
              BY:  LAWRENCE R. CAGNEY
 4                Attorney at Law
              444 West Ocean Boulevard
 5            Suite 1614
              Long Beach, California  90802-4524
 6            562.432.2551

 7                    -and-

 8            KRIEGER & KRIEGER
              BY:  TERRENCE B. KRIEGER
 9                Attorney at Law
              249 East Ocean Boulevard
10            Suite 750
              Long Beach, California  90802
11            562.901.2500

12

13

14        FOR DEFENDANTS:

15            LITTLER MENDELSON
              BY:  DOMINIC J. MESSIHA
16                Attorney at Law
              2049 Century Park East
17            Fifth Floor
              Los Angeles, California  90067
18            213.553.0308

19

20

21

22

23

24

25
```

```
 1                          I N D E X
 2     EXAMINATION                                          PAGE
 3             BY MR. MESSIHA                                  5
 4
 5                       E X H I B I T S
 6     DEFENDANTS'                                          PAGE
 7     1        March 25, 2011, declaration and report      81
 8              (19 pages)
 9     2        March 25, 2011, revised declaration and    108
10              report  (21 pages)
11     3        Invoices from Phillips Fractor Gorman to    145
12              Larry Cagney  (6 pages)
13     4        E-mail dated 25 March 2011 to Philip        146
14              Gorman from Lawrence R. Cagney  (1 page)
15
16                    INFORMATION REQUESTED
17                          (NONE)
18
19                     MARKED QUESTIONS
20                          (NONE)
21
22
23
24
25
```

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH VS. CEVA LOGISTICS U.S., INC.

1    declaration?

2        A       Correct.

3        Q       Other than that report, is there any other

4    report or analysis that you generated in this case?

5        A       Yes.

6        Q       And what's that?

7        A       When I was looking at -- basically, I made a

8    minor change in the calculations in that report.

9        Q       In the March 25th or in the other version?

10       A       In the March 25th which, of course -- I was

11   revising the March 25th report, and at that point my

12   revised report is not March 25th.

13       Q       Okay.  So since the March 25th declaration and

14   report, you generated an additional report or a

15   different version of that report?

16       A       It's a very slightly different version.  Yes.

17       Q       Okay.  And what has been changed in the

18   subsequent version?

19       A       The only thing that has changed were some

20   calculations that were designed to account for an

21   obscure sort of rounding error that occurs in Microsoft

22   Excel.

23       Q       And which components of your report and/or its

24   attached tables did that obscure rounding error impact?

25       A       I believe it was only table 1.

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH VS. CEVA LOGISTICS U.S., INC.

1    Q    Sure.

2    A    Well, obviously I reviewed some e-mails.

3    Q    Those are -- e-mails between you and Mr. Cagney

4    is how you referenced them; is that right?

5    A    Correct.  Yes.  The document we were talking

6    about previously was the plaintiffs' renewed motion for

7    class certification.

8    Q    Anything else that you recall reviewing in

9    preparation for drafting your analyses and conclusions?

10   A    No.

11   Q    Other than Mr. Cagney, did you speak with

12   anyone else in preparation for drafting your report and

13   conclusions in the case?

14   A    Yes.

15   Q    Whom did you speak with?

16   A    Sean Chasworth.

17   Q    Who is Mr. Chasworth?

18   A    He's a research associate in my office.

19   Q    Anyone else?

20   A    Justin Baker, also a research associate in my

21   office.

22   Q    Anyone else?

23   A    I don't think so.

24   Q    Did you have any conversations with Mr. Smith,

25   the plaintiff in the case, in preparation for drafting

**PHILIP GORMAN, PH.D. - May 16, 2011**
**SMITH VS. CEVA LOGISTICS U.S., INC.**

1    your report and the conclusions?

2        A    No.

3        Q    Did you have any conversations with anyone else

4    that you knew to be a member of the putative class in

5    this case in preparation for drafting your report and

6    conclusions?

7        A    Not that I know of.  If I did, it was only by

8    pure random chance, and we would have talked about

9    something else.

10       Q    Did you seek to speak with any of those

11   individuals in conjunction with preparing your report

12   and analysis?

13       A    No.

14       Q    Any particular reason why not?

15       A    Yes.

16       Q    And why is that?

17       A    Because I didn't see a reason to do so.

18       Q    As far as you could tell from your analysis,

19   it's unnecessary to speak with any putative class

20   members in order to reach the conclusions and analysis

21   in your report.

22            Is that fair?

23            MR. CAGNEY:  Objection.  Vague.  Overbroad.

24            THE WITNESS:  To accomplish the assignment I

25   was given I found it unnecessary to talk to any putative

**LUDWIG KLEIN REPORTERS & VIDEO, INC. - 800.540.0681**

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH VS. CEVA LOGISTICS U.S., INC.

1    class members.

2    BY MR. MESSIHA:

3        Q     And what specifically was the assignment that

4    you were given?

5        A     I was given -- the general assignment was, with

6    the types of data we have, is there a methodology that

7    could be used to assess liability and damages on two

8    issues; one, the extent to which the putative class

9    members may have missed meal breaks; and the extent to

10   which they may have worked off the clock.

11       Q     Any other components to the assignment that you

12   were given?

13       A     No.

14       Q     And was that assignment communicated to you by

15   Mr. Cagney?

16       A     Yes.

17       Q     In preparation either for today's deposition or

18   for constructing your report and analyses and

19   conclusions did you have the opportunity to review any

20   orders from the Court in this case?

21       A     I don't remember that for sure.  If I did, it's

22   on one of the DVDs.

23       Q     Do you remember in conjunction with your work

24   in this case ever reviewing a Court order dated sometime

25   in September of 2010 which would have been an order from

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH VS. CEVA LOGISTICS U.S., INC.

```
 1   March 25th?

 2           And, actually, your -- before I ask for an

 3   answer to that question it looks like your CV attached

 4   to your declaration is dated May, 2010, if that helps at

 5   all.

 6       A    I believe that's correct.  Yes.

 7       Q    So to your understanding, is that the same

 8   version of the CV that you've provided today in the

 9   documents?

10       A    Yes.

11       Q    And it's correct from your CV that you don't

12   have any formal legal training; correct?

13       A    Correct.

14       Q    And you did not attend law school; correct?

15       A    Correct.

16       Q    Your field of expertise is in statistics; is

17   that right?

18       A    Statistics, economics, and management.

19       Q    Do you have any understanding of what

20   California law currently requires in terms of meal

21   periods for employees?

22       A    I think I have an understanding.  I'm aware

23   that there is disagreement among some lawyers.  But I

24   think I have some understanding, yes.

25       Q    And what understanding is that, taking into
```

1    account that there is some disagreement?

2        A    Well, again, this is a legal question for a

3    trier of fact to decide on and for lawyers to argue

4    about.  But my general understanding is that the

5    California Labor Code says that, when an hourly worker

6    works a shift over five hours, then that worker must

7    have a meal break of at least 30 minutes.  My

8    understanding further is that it is possible for the

9    employee to sign a waiver that says, "I can work to six

10   hours without being required to have a meal break."  My

11   further understanding is that a second meal break is

12   required after -- within a shift of either ten hours or

13   12 hours, depending on how you look at it.  So, again, I

14   fully understand that's a legal question for someone

15   else to decide, but that's my general understanding.

16       Q    And so just to make sure I understand your

17   understanding, I think the words I heard in that

18   response were "must" and "required."

19            And so stemming from that, is your

20   understanding that the current state of the law requires

21   employers to ensure that meal periods are given versus

22   simply authorizing and permitting meal periods to be

23   given?

24            MR. CAGNEY:  Objection.  Calls for legal

25   conclusions.  Outside the scope of this witness'

26

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH VS. CEVA LOGISTICS U.S., INC.

1    expertise.

2           THE WITNESS:  Correct.  That's a legal --

3    requires a legal conclusion, but I do believe the

4    California Labor Code uses the language that the

5    employer must provide a meal break, and I understand

6    that's part of the dispute between various lawyers.

7    BY MR. MESSIHA:

8       Q    Right.  The issue is actually pending before

9    the State Supreme Court as to what provide means,

10   whether it means, is an employer required to ensure that

11   that meal period is actually given, or is it sufficient

12   for the employer simply to authorize and permit the meal

13   period to be given.

14          Do you have an understanding that that is the

15   source of the debate?

16      A    That sounds pretty much correct.  But, again, I

17   don't want to get into that too much because that's for

18   someone else to decide like the Supreme Court, for

19   example.

20      Q    Right.  And I don't mean for this to be a law

21   school examination, but the reason I ask is that I think

22   from our perspective, anyway, this factors in pretty

23   prominently into the validity of your analysis, so

24   that's why I'm pursuing that course.

25          So with that explanation in mind, I'll ask you

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH VS. CEVA LOGISTICS U.S., INC.

1    the following question:  With respect to your analysis

2    of meal periods and -- which is contained in your report

3    and conclusions, did you take into consideration whether

4    the employer's obligation for meal periods was to ensure

5    or, rather, to authorize and permit?

6              MR. CAGNEY:  Same objections.

7              THE WITNESS:  In my calculations I'm going to

8    use different language.  My calculations determine

9    whether or not the person had a meal break.

10   BY MR. MESSIHA:

11       Q    And as far as your calculations go, that is the

12   ultimate question without any additional necessary

13   analysis?

14             MR. CAGNEY:  Objection.  Vague.

15             THE WITNESS:  If you want to assess whether or

16   not people had a meal break, that's what my methodology

17   does.  If you want to assess something else, I could use

18   a different methodology to do that.

19   BY MR. MESSIHA:

20       Q    So in other words, with your analysis, if an

21   employee missed a meal -- and assume that the records

22   you analyzed satisfied you, anyway, that the employee

23   missed a meal in a particular day -- is it your

24   understanding that no further inquiry would be necessary

25   to determine whether there was liability on behalf of

28

1   the employer for that missed meal?

2          MR. CAGNEY:  Objection.  Vague.  Incomplete

3   hypothetical.

4          THE WITNESS:  Again, that requires a legal

5   determination of when the employee must take a meal

6   break or if the employee is entitled to skip a meal

7   break, even if the employer says, "You could take a meal

8   break, if you want."  So those are different legal

9   interpretations, and I don't have an opinion on that.

10  BY MR. MESSIHA:

11     Q     And so those different legal interpretations

12  did not factor into your analysis; correct?

13     A     They did.

14     Q     How so?

15     A     My analysis lays forth a methodology for

16  determining whether or not a person had a meal break.

17     Q     But your analysis does not set forth a

18  methodology to figure out whether a particular employee

19  missed a meal voluntarily or involuntary, for example?

20     A     Correct.

21     Q     So if a particular employee on a particular day

22  decided to work through a meal because, for example,

23  they weren't hungry, that wouldn't factor into your

24  analysis at all; correct?

25          MR. CAGNEY:  Objection.  Incomplete

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH  VS. CEVA LOGISTICS U.S., INC.

1   be interested in seeing, if it existed, in order to

2   determine meal period liability?

3       A    Well, one type of archival data that may exist

4   could be that, if a person made a transaction while off

5   the clock, the company could actually have required that

6   person to fill out a form saying why that happened.

7   Those data could exist.  I don't know.

8       Q    Do you have any understanding whether that type

9   of data exists in this case?

10      A    No.

11      Q    Do you know from looking at the data that CEVA

12  has produced in this case whether those types of forms

13  are reflected within that data?

14      A    No, I don't.  It is possible there's a field in

15  those data that might indicate that, that might indicate

16  why a person missed a meal break or worked off the

17  clock.  It's possible there's a field in there like

18  that, but those databases are otherwise a little hard to

19  decipher.  So I don't know if that type of information

20  is in those databases or not.

21      Q    Do you know if those databases will tell you or

22  can tell you simply whether such a form exists?

23           MR. CAGNEY:  Objection.  Vague and ambiguous.

24  Incomplete hypothetical.  I think it bears mention also

25  that the data production by defendant ordered by the

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH VS. CEVA LOGISTICS U.S., INC.

1    incoming or outgoing records.  Obviously, they think

2    there's something different about the ingoing or

3    outgoing, but I don't know how the company thinks the

4    CAHAW records differ.  So that's the reason for the

5    qualification.

6         Q      From your perspective did the CAHAW records

7    differ from the other two sets?

8         A      I don't know if they differ in terms of the

9    purpose, but, yes, there were some differences.

10        Q      What were the differences?

11        A      One difference is, the CAHAW records either

12   always or at least almost always had a transaction time

13   associated with the record.

14        Q      And the other two sets did not?

15        A      The other two sets sometimes did; sometimes did

16   not.

17        Q      And so the other two sets were not used at all

18   in your analysis and conclusions; correct?

19        A      They were used in my conclusions only to the

20   extent that I concluded that I didn't want to use those

21   at this point until I got clarification, but they are

22   not reflected in the numbers in my report.

23        Q      And so the only set of transaction records

24   reflected in the numbers in your report are the

25   transaction records found within the one database that

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH  VS. CEVA LOGISTICS U.S., INC.

1    you identify as CAHAW?

2         A    Correct.

3         Q    Now, at some point in your declaration and

4    report you concluded or opined that the transaction

5    timestamps in these databases are unreliable; is that

6    correct?

7              MR. CAGNEY:  Objection.  Misstates the witness'

8    testimony.

9              THE WITNESS:  I don't think I said that.

10   BY MR. MESSIHA:

11        Q    Did you view any of the timestamps in the three

12   different databases, either in the one you used or the

13   two you didn't use, as having reliable transaction times

14   in them?

15             MR. CAGNEY:  Same objection.

16             THE WITNESS:  To the extent the transaction

17   times actually appear, I don't know if they're correct

18   or not.

19   BY MR. MESSIHA:

20        Q    You took them at face value; correct?

21        A    Yes.

22        Q    You did not try to verify externally in any way

23   whether those transaction times are accurate; correct?

24        A    Correct.

25        Q    You didn't talk to any individual, for example,

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH VS. CEVA LOGISTICS U.S., INC.

1    whose transaction times are reflected within the

2    transaction records to determine whether those times are

3    accurate; correct?

4        A    Correct.

5        Q    And you didn't have, in constructing your

6    analysis, any indication that the timestamps in the

7    transaction records, for example, were synchronized with

8    the clock-in and clock-out records of the employees in

9    Kronos; correct?

10            MR. CAGNEY:  Objection.  Vague.  Sorry.

11    Objection.  Vague.  Compound.  Incomplete hypothetical.

12            THE WITNESS:  Yeah.  That was a somewhat long

13    question.

14            Could I just have that again somehow?

15    BY MR. MESSIHA:

16        Q    That was a pretty long question.  Let me try

17    that again.

18            You didn't have any indication one way or

19    another that the timestamps in the three databases, any

20    of the three databases, were synchronized with the

21    timestamps in Kronos; correct?

22            MR. CAGNEY:  Objection.  Vague.

23            THE WITNESS:  Yeah.  I'm not -- I'm not sure

24    exactly how to interpret the word "synchronized" in that

25    question.  I think I sort of -- I can guess what you're

47

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH VS. CEVA LOGISTICS U.S., INC.

1    Kronos?

2    BY MR. MESSIHA:

3        Q      Correct.

4        A      Correct.

5        Q      And you assumed in reaching your conclusion and

6    analysis that the transaction timestamps were accurate;

7    correct?

8        A      I think we talked about this already.   I took

9    them at face value.   I don't know if they're accurate or

10   not.

11       Q      A few minutes ago when I asked you about your

12   assumptions, one of the assumptions that you gave was

13   that the transaction times were accurate and complete.

14           Do you recall that?

15           MR. CAGNEY:   Objection.   Mischaracterizes the

16   witness' testimony.

17           THE WITNESS:   No, I don't recall that.

18   BY MR. MESSIHA:

19       Q      Okay.   We'll ask it a different way.   In taking

20   the transaction times at face value from the transaction

21   database that you used, did you also take the punch

22   times in Kronos at face value?

23       A      Yes.

24       Q      In other words, for your analysis to work both

25   the transaction times and the Kronos times had to be

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH VS. CEVA LOGISTICS U.S., INC.

1    hypothetical.

2             THE WITNESS:  It's possible.

3    BY MR. MESSIHA:

4        Q    In other words, your analysis and conclusions

5    took the user IDs listed for particular transactions at

6    face value; correct?

7        A    Correct.

8        Q    In other words, if employee John Smith was

9    listed as the employee who input a particular

10   transaction within the records, you assumed for the

11   purposes of your analysis and conclusions that John

12   Smith was actually the employee that input that

13   transaction; correct?

14       A    That's correct.

15       Q    If on the other hand it turned out that Jane

16   Doe input that particular transaction, that would

17   certainly impact your analysis and conclusions; correct?

18       A    It could.

19       Q    In what scenario, if any, would that

20   information not impact your analysis and conclusions?

21            MR. CAGNEY:  Objection.  Incomplete -- calls

22   for speculation.

23            THE WITNESS:  Well, one scenario would be that,

24   if John Smith and Jane Doe did, in fact, start work at

25   the same time that day and they ended work at the same

**PHILIP GORMAN, PH.D. - May 16, 2011**
**SMITH VS. CEVA LOGISTICS U.S., INC.**

1    totaling 200 workdays?

2          MR. CAGNEY:  Objection.  Vague.  Ambiguous.

3    Compound.

4          THE WITNESS:  The sample of Kronos workdays was

5    totally independent of the sample of days from the

6    transactions database.  It's possible by random chance

7    there might have been some overlap.

8    BY MR. MESSIHA:

9          Q    So would it be accurate to say it's a maximum

10   of 200 workdays sampled out of the 260,000 available

11   within the records produced to you?  Correct?

12         A    Well, there were 260,000 in the -- I think in

13   the Kronos database.  I'm not sure how many there were

14   in the transaction database that I used.

15         Q    Okay.  So it's at least 260,000 workdays?

16         A    Yes.

17         Q    Probably more, but you're not sure?

18         A    I would not even speculate on saying probably

19   more but --

20         Q    Okay.  So just so I understand what you did or

21   what your office did in these calculations, you looked

22   at a maximum of 200 workdays out of a possible number of

23   at least 260,000 workdays; correct?

24         A    Right.

25         Q    Do you know what that translates to in terms of

1    a percentage?

2        A    It's not a calculation I made.

3        Q    My very limited math skills, I think, put that

4    at .07 percent.

5             Does that sound accurate?

6        A    It seems about right.

7        Q    Any particular reason why you didn't use more

8    workdays, if those were available to you?  Do you

9    understand the question?

10       A    You stopped with "to," so, no, I don't

11   understand the question.

12            MR. MESSIHA:  Could you have the question read

13   back, please?

14            (Record read as follows:

15               "Q    Any particular reason why

16            you didn't use more workdays, if

17            those were available to you?")

18            THE WITNESS:  Oh.  I didn't hear the "you."

19   Yes.

20   BY MR. MESSIHA:

21       Q    Why not?  Why or why not?

22       A    Well, we talked about this already.  Based on

23   experience I made a guesstimate that, if we looked at

24   100 data points, then we would get a pretty good idea of

25   what was going on and we'd get a pretty good idea of

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH VS. CEVA LOGISTICS U.S., INC.

1        A      Yes.

2        Q      And the meal period analysis essentially, as I

3    understand it, consisted of comparing transaction times

4    with Kronos records for a particular employee; correct?

5        A      That was part of it.

6        Q      And for that part of it your analysis assumes

7    that, if a transaction was recorded during a time when

8    that same employee was punched out for a meal, in that

9    scenario, for example, there was a meal period

10   violation; correct?

11       A      I actually never used the word "violation" in

12   my report.

13       Q      What did you conclude with respect to meal

14   periods under that set of circumstances?

15       A      I counted that as a person who did not have a

16   meal period or did not have that meal period.

17       Q      Would it be accurate to say that that's a

18   person whom the records available to you indicated did

19   not have a meal period?

20       A      Did not have that particular meal period.

21       Q      Assuming again that the transaction times are

22   accurate and that the Kronos records are accurate;

23   correct?

24       A      I'm not sure what that question is asking.

25       Q      Sure.  You told me earlier today that one of

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH VS. CEVA LOGISTICS U.S., INC.

1    being reliable; correct?

2        A      The methodology does not.  The methodology --

3    my conclusion is, the methodology works.  We can compare

4    the Kronos records to the transaction records.

5        Q      As long as you take the times at face value.

6        A      That's what I've done.

7        Q      But you'd agree that that is a prerequisite to

8    the validity of the analysis?

9        A      Well, if the times are all wrong, then, yes, I

10   would start to question whether or not this valid

11   methodology is going to yield useful results.

12       Q      In other words, the methodology, while perhaps

13   valid in the abstract, if applied using data that's not

14   reliable, would be called into question; correct?

15       A      If the data are all wrong, then, yes.

16       Q      And the same answer would be true if only one

17   component of the data was wrong, for example, the

18   transaction times; correct?

19       A      Well, we talked about this before.  It depends

20   how wrong they are.

21       Q      If they are -- let me back up.  Do you have any

22   threshold for what you would consider to be reliable

23   timestamps on transactions?

24       A      Again --

25              MR. CAGNEY:  Excuse me.  May I have the -- I'm

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH VS. CEVA LOGISTICS U.S., INC.

1    number?

2        A    No.

3        Q    Now, you testified earlier that you were not

4    necessarily looking for meal period violations but were,

5    rather, looking at methodology to determine whether on a

6    particular day a particular meal was taken or not;

7    correct?

8        A    Correct.

9        Q    Now, I note here in the top line of table 4

10   that it's labeled "summary of selected meal break

11   violations."

12           Do you see that?

13       A    Yes.

14       Q    Was there a different methodology that you

15   employed with respect to these two examples than your

16   general methodology which you stated was not searching

17   for violations?

18       A    Yes.  I did not need to use the word

19   "violations" here.  I used that only on the assumption

20   that a shift over six hours, anyway, needs to have at

21   least one meal break.  So you can call it "a violation"

22   or not and --

23       Q    I believe you stated earlier that the issue of

24   whether a violation occurred or not is a question for

25   the trier of fact.

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH VS. CEVA LOGISTICS U.S., INC.

1              Correct?

2       A     That's correct.

3              MR. CAGNEY:  Move to strike for the purpose of

4      interposing the objection.  That calls for a legal

5      conclusion.

6      BY MR. MESSIHA:

7       Q     Turning back to table 2 for a second, in

8      structuring a comparison of the transaction records to

9      the Kronos records you obviously compared transaction

10     records from the same date as the corresponding Kronos

11     record; correct?

12      A     That's what we tried to do.

13      Q     In other words, for the purpose of the analysis

14     it would make sense to compare February 1st, '06,

15     transactions with February 1st, '06, Kronos punches;

16     right?

17      A     Yes.

18      Q     There wouldn't be any value, as far as you're

19     concerned, in comparing February 1, 2006, transactions

20     with February 5th, 2006, punches; right?

21      A     Correct.

22      Q     And the same would be true, obviously, with

23     respect to years.

24              You wouldn't want to compare your February 1st,

25     '06, with your -- you'd want to compare your

106

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH  VS. CEVA LOGISTICS U.S., INC.

1    February 1st, '06, transactions with your February 1st

2    punches from '06 and not from '07; right?

3         A    Correct.

4              MR. MESSIHA:  All right.  Is this a good time

5    to have a bite?

6              MR. CAGNEY:  Yes, it is.

7              (Lunch recess:  1:05 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH VS. CEVA LOGISTICS U.S., INC.

1                    Los Angeles, California

2                    Monday, May 16, 2011

3                         1:35 p.m.

4

5                    FURTHER EXAMINATION

6    BY MR. MESSIHA:

7        Q      Dr. Gorman, good afternoon.

8        A      Good afternoon.

9        Q      You understand that you're still under oath

10   this afternoon?

11       A      Yes.

12       Q      During the break, as directed, I went into one

13   of the DVDs that you produced to us today and located

14   what I think is your revised declaration.  It was

15   captioned or the file was something like "supplemental

16   declaration of Philip Gorman."

17              Does that sound correct to you?

18       A      That sounds correct.

19              MR. MESSIHA:  Okay.  I'm going to hand you and

20   your counsel a copy of it, and let's see if I found the

21   correct document.  We're going to mark this as

22   Exhibit 2.  If you'll just take a minute, look through

23   that and tell me if this is actually the revised

24   declaration and report.

25              (Defendants' Exhibit 2 was marked

                                                         108

LUDWIG KLEIN REPORTERS & VIDEO, INC. - 800.540.0681

1           for identification by the Certified

2           Shorthand Reporter.)

3           THE WITNESS:  Yes.  It looks like it.

4    BY MR. MESSIHA:

5        Q     Now, one thing I noted on page 8 is that the

6    signature and date hadn't changed on it.

7           Is that accurate?  And when I say "is that

8    accurate," in other words, is that supposed to be there?

9        A     No.  That should have said, I think, the 15th

10   of May; yesterday, whatever that was.

11       Q     Okay.  Did you actually physically sign a new

12   version of it or just slide the revised table 1 into the

13   prior declaration?

14       A     My signature is just an electronic signature

15   that I paste in.

16       Q     Okay.  So you haven't actually physically

17   reprinted a copy of your declaration since March and

18   resubmitted it to anybody?

19       A     Correct.

20       Q     But is it correct that you've transmitted in

21   some form Exhibit 2 to your counsel, Exhibit 2 being

22   what we're calling "the revised declaration"?

23       A     No.

24       Q     Okay.  So they -- this is the first they've

25   seen it?

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH  VS. CEVA LOGISTICS U.S., INC.

1       A    Yes.

2       Q    Okay.  The one thing that I noted right off the

3  bat that was different in Exhibit 2 from Exhibit 1 is

4  page 14 which is table 1, and you're free to pull up

5  page -- table 1 of your Exhibit 1, as well, if you want

6  to compare them, because I'm going to have both of them

7  open in front of me as we talk about it.

8            Okay?  And can you confirm for me by looking at

9  the two versions of table 1 that the table 1, which

10  appears in Exhibit 2, which is the more recent one is,

11  in fact, revised from the table 1 in Exhibit 1?

12      A    Yes.

13      Q    And you said in addition to this there were

14  also other changes that you made to your declaration

15  that accompany or correspond in any way to the changes

16  in this table?

17      A    Yes.  To the extent that table 1 is explained

18  in the text portion, I had changed the numbers there.

19      Q    Okay.  Other than things relating to table 1,

20  do we need to revisit other questions and answers about

21  the other tables in your declaration from this morning,

22  or are those unaffected by Exhibit 2?

23      A    The other tables are not changed.

24      Q    So in other words, the answers that you gave

25  earlier today pertaining to things other than table 1 in

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH  VS. CEVA LOGISTICS U.S:, INC.

1    your declaration and the report are still the same;

2    correct?

3          A    Yes.

4          Q    Looking at the second line of text down from

5    the top, the "number of person-days examined" stays the

6    same at a hundred; correct?

7          A    Correct.

8          Q    The number of "shifts exactly 8 hours with no

9    meal break" goes down from 11 to nine; correct?

10         A    Correct.

11         Q    Which means, essentially, you found two fewer

12   individuals that you thought were exempt than you did in

13   the first round of table 1?

14         A    Correct.

15         Q    The "shift exactly 9 hours with a meal break of

16   exactly one hour" stays unchanged from one to two;

17   correct?

18         A    Correct.

19         Q    And as a result of the two fewer people that

20   you deemed to be exempt, the "net number of

21   person-shifts examined" goes from 77 to 79?

22         A    Correct.

23         Q    The "net number of shifts over 6 hours, in the

24   sample" drops from 73 to 72; is that right?

25         A    Correct.

111

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH  VS. CEVA LOGISTICS U.S., INC.

1        Q      The "shifts over 6 hours showing a meal break

2    at least 30 minutes" goes up from 49 to 57; correct?

3        A      Correct.

4        Q      And that's about a 12 percent increase over

5    what you found in the first draft?

6        A      12 percentage points.

7        Q      And the next line, "shifts over 6 hours showing

8    a meal break at least 27 minutes" stays the same at 62;

9    correct?

10       A      Correct.

11       Q      But the percentage goes up by virtue of the

12   number of -- "net number of person-shifts" increasing?

13       A      By the number of --

14       Q      That doesn't seem right:

15       A      That's not right because -- that's not right.

16       Q      Okay.  Correct me, please.

17       A      It's because the 86.1 is 62 divided by 72

18   because here we're only talking about shifts over six

19   hours.

20       Q      I see.  Okay.  So the "number of shifts over 6

21   hours" dropped by one which is what generates the

22   1.2 percent increase in the 27-minute analysis?

23       A      Correct.

24       Q      And you testified that 27 minutes was something

25   provided to you by counsel -- correct? -- not the

                                                        112

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH  VS. CEVA LOGISTICS U.S., INC.

1    information but the precept?

2            MR. CAGNEY:  Objection.  Asked and answered.

3            THE WITNESS:  The concept, yes.

4    BY MR. MESSIHA:

5        Q    Okay.  "Shifts over 6 hours showing a meal

6    break at least 30 minutes starting within 5 hours" goes

7    from 13 to 18?

8        A    That's correct.

9        Q    With an increase from 17.8 percent to

10   25 percent; correct?

11       A    Correct.

12       Q    This line is highlighted in both drafts; right?

13       A    Yes.

14       Q    Why is that?

15       A    Just going on memory here, I believe this is

16   simply one key standard that I talked about with Larry

17   Cagney.

18       Q    Did Mr. Cagney ask you to do separate analyses

19   for meals starting within five hours and those starting

20   at some other time?

21       A    Not at any other specific time other than the

22   other two lines you show -- you see above dealing with

23   shifts over six hours showing a meal break of at least

24   30 minutes and 27 minutes.

25       Q    But at least as to the first five hours' time

113

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH VS. CEVA LOGISTICS U.S., INC.

1   constraint that was something related to you by

2   Mr. Cagney?

3       A    Correct.

4       Q    Do you have an understanding where that

5   requirement comes out in the law?

6       A    Well, again, a legal question.  But my

7   understanding is that even if somebody signs a meal

8   break waiver saying a shift up to six hours, they don't

9   need a meal break, then it still says that on a shift --

10  even if you have a meal break, a shift over six hours,

11  the meal break still needs to start within five hours.

12      Q    Do you have any understanding of whether the

13  issue of when a meal break must start is under review by

14  the State Supreme Court?

15          MR. CAGNEY:  Objection.  Calls for a legal

16  conclusion.  Beyond the scope of this witness'

17  expertise.

18          THE WITNESS:  No.

19  BY MR. MESSIHA:

20      Q    Did your analysis and conclusions take into

21  account the potential existence of meal period waivers?

22          MR. CAGNEY:  Objection.  Vague.

23          THE WITNESS:  Well, again, that calls for a

24  legal conclusion.  But my understanding is that the

25  shift over six hours standard assumes there's a meal

114

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH  VS. CEVA LOGISTICS U.S., INC.

1    break waiver.  That's my understanding, but I don't know

2    that.

3    BY MR. MESSIHA:

4        Q    So in other words, it's your testimony that, by

5    splitting up the meal period analysis with shifts over

6    six hours and all shifts, you've accounted for the

7    potential existence of meal period waivers?

8             MR. CAGNEY:  Objection.  Calls for a legal

9    conclusion.  Beyond the scope of the witness' expertise.

10            THE WITNESS:  Based on what I've heard in other

11   cases, that would be the basis for the six-hour

12   standard.  But, again -- I'll resay it -- I don't know

13   that for sure in this case.

14   BY MR. MESSIHA:

15       Q    You don't know one way or the other whether

16   there were meal period waivers in place for any of the

17   putative class members in this case?

18       A    Correct.

19       Q    The "number of shifts for which transactions

20   were found for any date" went up from 27 to 74; is that

21   right?

22       A    No, not quite right, because again from

23   Exhibit 1 I indicated that label was not correct.  That

24   was the number of shifts for which transactions were

25   found for that person for that date, for the selected

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH  VS. CEVA LOGISTICS U.S., INC.

1    date.

2         Q    Okay.  So that would be represented by the very

3    last line in Exhibit 2?

4         A    Correct.

5         Q    So that jumped from 27 to 48?

6         A    Correct.

7         Q    And the line immediately above that was not

8    present anymore in Exhibit 1; right?

9         A    That's correct.

10        Q    And what that indicates is that, for some

11   portion of the people sampled, there were transactions

12   for a date but not the date you were looking for?

13        A    Not the date randomly selected from the Kronos

14   records or not necessarily from that date.

15        Q    But there were transactions somewhere in the

16   data for them?

17        A    Correct.

18        Q    Now, how would the change in the number of

19   shifts for which transactions were found for the

20   selected date for that person change from 27 to 48 by

21   virtue of a rounding error in Excel?

22        A    That would not be related to the rounding

23   error.

24        Q    What would that be related to?

25        A    I'm not sure.  I would have to look back to

116

1    determine that.

2        Q     How did you determine that that number needed

3    revision in Exhibit 2?

4        A     I simply went through the database column by

5    column, line by line, and updated things as I saw fit.

6        Q     Did anything in particular trigger your

7    attention to that initial number being inaccurate?

8        A     No.

9        Q     Did anybody bring that to your attention?

10       A     Did anyone bring what to my attention?

11       Q     The inaccuracy of that line in Exhibit 1.

12       A     No.

13       Q     Was that simply a case of the number being

14   incorrectly calculated, or was it a case of the -- let

15   me rephrase that.

16           Did you have to rerun the comparison in order

17   to come up with the new number of 48, or was that simply

18   an error in reporting what was initially located?

19           MR. CAGNEY:  Objection.  Vague.

20           THE WITNESS:  I do have a clarification on

21   this.

22           MR. MESSIHA:  Sure.

23           THE WITNESS:  In Exhibit 1 which was my initial

24   report, that 27 shifts for which a transaction was found

25   for that date was only among the 77, quote, unquote,

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH VS. CEVA LOGISTICS U.S., INC.

1    non-exempt shifts.  But this revised table looks at all

2    100 shifts.

3    BY MR. MESSIHA:

4        Q    So in other words, the new number reflects

5    transactions input by individuals that you determined at

6    least preliminarily to be exempt?

7        A    Correct.

8        Q    Looking at the text of your declaration,

9    Exhibit 2, paragraph 13, page 6 --

10       A    Okay.

11       Q    -- it says:

12                  "Tables 1 and 2 describe my

13             initial findings.  These findings

14             could change as new information

15             becomes available."

16             Do you see that?

17       A    Yes.

18       Q    Did that change in any way from -- did that

19   text change in any way from Exhibit 1?

20             MR. CAGNEY:  Objection.  The documents speak

21   for themselves.

22             THE WITNESS:  I don't think so.

23   BY MR. MESSIHA:

24       Q    I also see table 1 mentioned at paragraph 16,

25   second sentence.

                                                          118

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH  VS. CEVA LOGISTICS U.S., INC.

```
 1              You didn't revise paragraph 16, either, in
 2    Exhibit 2?
 3              MR. CAGNEY:  Same objection.
 4              THE WITNESS:  I don't think so.  No.
 5    BY MR. MESSIHA:
 6         Q    Can you point to the portions of Exhibit 2's
 7    declaration that were revised as a result of your
 8    revising table 1?
 9         A    No.
10         Q    Is it your -- is it still your belief that you
11    made revisions to your declaration as a result of the
12    revisions to table 1?
13         A    I'm sorry.  I didn't catch that.
14         Q    You testified earlier in the day today that you
15    made some corresponding revisions to your declaration as
16    a result of the revisions to table 1.
17              Is that still your understanding?
18         A    No.  That would be paragraph 12.  And it turns
19    out I did not change the numbers in the subparagraphs on
20    paragraph 12.
21         Q    Did you make any changes to your declaration
22    that you can recall or see, as you sit here today, as a
23    result of the revisions to table 1?
24         A    Other than table 1 itself, no.
25         Q    Correct.  Yeah.  I'm referring to the actual
```

                                                            119

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH  VS. CEVA LOGISTICS U.S., INC.

1    text of the declaration, not the exhibits which would be

2    from pages 1 through 8.

3        A    Correct.  My main goal was simply to present

4    from the new table 1.

5        Q    As a result of the revisions to table 1, is the

6    statement in paragraph 12.f. of your declaration still

7    accurate?

8        A    No.

9        Q    What changes would need to be made to paragraph

10   F to render it consistent with the revised table 1?

11       A    Well, the 77 would change to 79.  The 73 would

12   change to 72.

13       Q    And that's the first number of the second

14   sentence in paragraph F?

15       A    Correct.  The 13 would change to 18.  The

16   15.8 percent would change to 25.0 percent.

17       Q    Anything else in paragraph F?

18       A    No.  No.

19       Q    How about paragraph G?  Any changes there that

20   would be necessitated by the revision to table 1?

21       A    The 77 would change to 79.  Sorry.  The 77

22   would change to 100, and the non-exempt would disappear.

23   The "only 27" would change to 74.

24       Q    You removed the word "only" from that?

25       A    Yes.

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH  VS. CEVA LOGISTICS U.S., INC.

1       Q      Any other changes in G?

2       A      No.

3       Q      Footnote 4 in G would remain unchanged, as

4    well?

5       A      Yes.

6       Q      Any other revisions to your declaration -- the

7    text of your declaration only, not the exhibits -- that

8    would be necessitated by the revisions to table 1?

9       A      I don't think so.  No.

10      Q      Any revisions to any of the other tables that

11   would be necessary as a result of the revisions to

12   table 1?

13      A      No.

14      Q      And no changes were made already to any of the

15   other tables by virtue of the revisions to table 1;

16   correct?

17             MR. CAGNEY:  Objection.  Vague.

18             THE WITNESS:  Could I hear that again?

19   BY MR. MESSIHA:

20      Q      Sure.  I just asked you whether any changes

21   were necessary to the other tables as a result of the

22   changes to table 1, and my question now is whether you

23   have already made any changes to any of the other tables

24   by virtue of the changes to table 1.

25      A      No.

121

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH VS. CEVA LOGISTICS U.S., INC.

1     from the Kronos database.

2         Q     So these are -- these two individuals are

3     people who are within the sample of 100?

4         A     Correct.

5         Q     Did you make any attempt to sort that sample to

6     identify either of these two individuals?

7         A     No.

8         Q     And you haven't spoken to either of these two

9     individuals about their transactions that are identified

10    here; correct?

11        A     Correct.

12        Q     Or about anything relating to the case;

13    correct?

14        A     Correct.

15        Q     Let's turn back to paragraph 12.h. of your

16    declaration which is in Exhibit 5.  I had asked you

17    earlier in the day about the number of employee-days

18    located in the transactions database.

19              Do you remember that?

20        A     Could I hear that again?

21        Q     Sure.  Earlier in the day, not that long ago,

22    we discussed whether you could estimate for me the

23    amount of workdays -- or I think they're referenced in

24    here as employee-days -- that were contained in the

25    transaction database that you analyzed.

123

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH VS. CEVA LOGISTICS U.S., INC.

1       A       No.

2       Q       And the reason I ask that is because the user

3   ID that's listed anywhere for Mr. Adriano seems to have

4   a P in it, and I don't think there's a P in his

5   personnel name.

6       A       Correct.

7       Q       If the corresponding Kronos name is listed as

8   Adriano, Fidelio R., does that mean you didn't have

9   access to the full middle name?

10      A       I believe so.  Yes.

11      Q       Using Exhibit 2 which is your supplemental or

12  revised declaration, are there any additional

13  conclusions or findings you made that are not found

14  within that exhibit?

15      A       Well, yes, but I think we have talked about

16  them today.

17      Q       Any conclusions or findings that we haven't

18  talked about today and that are not within your

19  supplemental declaration and report in Exhibit 2?

20      A       Well, one thing -- I don't know if you can call

21  this "a conclusion" or something else, but I would like

22  to get a list of class members with full contact

23  information.

24      Q       I definitely would not call that "a

25  conclusion."

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH VS. CEVA LOGISTICS U.S., INC.

1       A       Okay.  Well, that was a conclusion.

2       Q       Your conclusion would be that you would like to

3    have that information to assist in your analysis;

4    correct?

5       A       Correct.

6       Q       Why would that assist in your analysis?

7       A       That could assist in my analysis for reasons we

8    have discussed.  When there is, for example, a

9    transaction long after a person punched out, then I

10   would like to be able to contact the person to ask them

11   why that happened.

12      Q       That would assist in your analysis?

13      A       It may assist in my analysis.

14      Q       You would want to do it before reaching any

15   further conclusions?

16              MR. CAGNEY:  Objection.  Vague.

17              THE WITNESS:  No.

18   BY MR. MESSIHA:

19      Q       I'm not sure I understand.  One of the things

20   that you would like to look at is a list of class

21   members so that you can contact people when there are

22   transactions indicated that fall far outside the punch

23   times; correct?

24      A       Yes.

25      Q       What would be the purpose for doing that?

PHILIP GORMAN, PH.D. - May 16, 2011
SMITH VS. CEVA LOGISTICS U.S., INC.

```
 1      A      The purpose for doing that would be, assuming

 2   class certification, I assume there would be further

 3   analysis that might include something like that.

 4      Q      For what purpose?

 5      A      Just to find out reasons for the gap between a

 6   punch out and a transaction.

 7      Q      Would it materially affect your analysis if in

 8   that situation the employee said that he or she

 9   voluntarily stayed to enter the transaction and nobody

10   knew about it?

11            MR. CAGNEY:  Objection.  Compound.

12            THE WITNESS:  I don't know.  That's not

13   something I've thought about.

14   BY MR. MESSIHA:

15      Q      Your analysis and methodology as proposed

16   doesn't account for whether the employer was aware, if

17   an employee was working off the clock, if that employee

18   was, in fact, working off the clock; is that right?

19      A      I'm sorry.  Can I hear that back?

20            MR. MESSIHA:  Let's try to read it back, and if

21   not, I can rephrase it for you.

22            (Record read as follows:

23                "Q      Your analysis and

24            methodology as proposed doesn't

25            account for whether the employer was
```

142

LUDWIG KLEIN REPORTERS & VIDEO, INC. - 800.540.0681

```
 1                    WITNESS' CERTIFICATE

 2

 3

 4

 5           I am the witness in the foregoing deposition.

 6   I have read the foregoing deposition, and, having made

 7   such changes and corrections as I desire, I certify that

 8   the same is true of my own knowledge, except as to those

 9   matters which are therein stated upon my information or

10   belief, and, as to those matters, I believe it to be

11   true.

12           I declare under penalty of perjury under the

13   laws of the State of California that the foregoing is

14   true and correct.

15           Executed on _____,

16   at _____.

17

18

19

20                          _____
21                          PHILIP C. GORMAN, Ph.D.

22

23

24

25
```

                                                            154

1                    REPORTER'S CERTIFICATE

2

3           I, John M. Taxter, CSR No. 3579, RPR, a

4    Certified Shorthand Reporter in and for the State of

5    California, do hereby certify:

6           That prior to being examined, the witness named

7    in the foregoing proceedings declared under penalty of

8    perjury to testify to the truth, the whole truth,

9    and nothing but the truth;

10          That said proceedings were taken by me in

11   shorthand at the time and place herein named and were

12   thereafter transcribed into typewriting under my

13   direction, said transcript being a true and correct

14   transcription of my shorthand notes;

15          Pursuant to Federal Rule 30(e), transcript

16   review was requested;

17          I further certify that I have no interest in

18   the outcome of this action.

19

20

21

22                    _____

                      JOHN M. TAXTER
23                    CSR NO. 3579

24

25

# EXHIBIT B

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

LONNIE R. SMITH,                    )
individually, and on               )
behalf of others similarly         )
situated,                          )
                                   )
            Plaintiffs,            )
                                   )
vs.                                )   No. CV09-4957 CAS (RCx)
                                   )
CEVA LOGISTICS U.S., INC.,         )
a Delaware corporation;            )
CEVA FREIGHT MANAGEMENT            )
INTERNATIONAL GROUP, INC.,         )
a Delaware corporation;            )
CEVA FREIGHT, LLC, a               )
Delaware limited liability         )
company; EGL EAGLE GLOBAL          )
LOGISTICS, LP, a Delaware          )
limited partnership; and           )
DOES 1 through 200,                )
inclusive,                         )
                                   )
            Defendants.            )
_____)

VOLUME I

DEPOSITION OF LONNIE RICHARD SMITH

Los Angeles, California

Tuesday, April 6, 2010

REPORTED BY:

KRISTIN L. MATTSEN
CSR NO. 12897

JOB NO.
63077LMF

# LUDWIG KLEIN
REPORTERS & VIDEO, INC.

10868 KLING STREET
TOLUCA LAKE, CALIFORNIA 91602
800.540.0681        FAX 818.508.6326
e-mail:  lois@ludwigklein.com

LONNIE SMITH, VOL. 1 - April 6, 2010
SMITH  VS. CEVA LOGISTICS U.S., INC.

| | | |
|---|---|---|
| 1 | you can answer the question without disclosing the | 10:05:15 |
| 2 | nature or content of those communications, then go | 10:05:19 |
| 3 | ahead; otherwise, I'll instruct you not to answer. | 10:05:22 |
| 4 | THE WITNESS:  Could you repeat that, | 10:05:25 |
| 5 | please. | 10:05:29 |
| 6 | MR. MESSIHA:  Sure. | 10:05:29 |
| 7 | We'll have the question read back, please. | 10:05:39 |
| 8 | (The record was read as follows: | 10:05:39 |
| 9 | "QUESTION:  When you initially sought out | 10:04:54 |
| 10 | counsel relating to this case, what was your | 10:04:56 |
| 11 | purpose in doing so?") | 10:04:58 |
| 12 | THE WITNESS:  Initially, to try to get my | 10:05:40 |
| 13 | job back.  That's all I wanted. | 10:05:50 |
| 14 | BY MR. MESSIHA: | 10:05:52 |
| 15 | Q    Did you feel that the circumstances of your | 10:05:55 |
| 16 | separation from CEVA were unfair in some way? | 10:05:58 |
| 17 | A    Yes. | 10:06:02 |
| 18 | Q    How so? | 10:06:02 |
| 19 | A    I'd gone out on disability and submitted my | 10:06:03 |
| 20 | claim to corporate; however, my doctor did not | 10:06:12 |
| 21 | submit in what corporate considered a timely | 10:06:18 |
| 22 | fashion, and I was terminated because of that. | 10:06:21 |
| 23 | Q    You felt at the time that that was unjust | 10:06:24 |
| 24 | or unfair? | 10:06:27 |
| 25 | A    That it was out of my control.  I did what | 10:06:29 |

LONNIE SMITH, VOL. 1 - April 6, 2010
SMITH  VS. CEVA LOGISTICS U.S., INC.

| | | | |
|---|---|---|---|
| 1 | Logistics.  They had changed names, the company. | | 10:32:34 |
| 2 | Q     The company that eventually became ABX | | 10:32:36 |
| 3 | Logistics? | | 10:32:40 |
| 4 | A     Yes. | | 10:32:40 |
| 5 | Q     I have no hope of pronouncing the first | | 10:32:40 |
| 6 | one, and the court reporter's going to -- | | 10:32:42 |
| 7 | A     No. | | 10:32:42 |
| 8 | Q     -- ask you to spell it on the break. | | 10:32:43 |
| 9 | Are you currently employed? | | 10:32:49 |
| 10 | A     No. | | 10:32:49 |
| 11 | Q     Have you held any jobs since the separation | | 10:32:50 |
| 12 | of your employment with CEVA Freight? | | 10:32:54 |
| 13 | A     No. | | 10:32:55 |
| 14 | Q     Have you sought other employment? | | 10:32:56 |
| 15 | A     Yes. | | 10:32:59 |
| 16 | Q     What types of employment have you sought | | 10:33:02 |
| 17 | since that time? | | 10:33:04 |
| 18 | A     Freight forwarding, international air | | 10:33:04 |
| 19 | export agent. | | 10:33:09 |
| 20 | Q     Getting back to Exhibit 2 for a moment, | | 10:33:19 |
| 21 | which was the offer letter that we looked at, as we | | 10:33:36 |
| 22 | discussed a moment ago, the offer letter stated your | | 10:33:43 |
| 23 | initial position as operations export specialist. | | 10:33:45 |
| 24 | Were you ever notified during your employment either | | 10:33:49 |
| 25 | with EGL Eagle Global Logistics, LP -- we'll refer | | 10:33:52 |

65

LONNIE SMITH, VOL. 1 - April 6, 2010
SMITH VS. CEVA LOGISTICS U.S., INC.

| | | |
|---|---|---|
| 1 | to that entity at "EGL" going forward -- or with | 10:33:58 |
| 2 | CEVA Freight, LLC, that that position title with | 10:34:02 |
| 3 | respect to you was changing in any way? | 10:34:05 |
| 4 | A    No. | 10:34:08 |
| 5 | Q    As far as you understood, your position | 10:34:10 |
| 6 | remained as operations export specialist until the | 10:34:13 |
| 7 | time of your separation with CEVA in 2008? | 10:34:16 |
| 8 | A    Yes. | 10:34:19 |
| 9 | Q    Let's take a look at Exhibit 3.  Same drill | 10:34:19 |
| 10 | with this document.  Take a moment to look at it. | 10:34:44 |
| 11 | Let me know when you're done, please. | 10:34:46 |
| 12 | (Defendants' Exhibit 3 was marked for | 10:34:46 |
| 13 | identification by the certified shorthand reporter.) | 10:34:46 |
| 14 | THE WITNESS:  Okay. | 10:36:04 |
| 15 | BY MR. MESSIHA: | 10:36:04 |
| 16 | Q    Have you had a chance to look at Exhibit 3? | 10:36:04 |
| 17 | A    Yes. | 10:36:06 |
| 18 | Q    Have you ever seen that document before? | 10:36:07 |
| 19 | A    I may have and just don't remember, because | 10:36:08 |
| 20 | all I dealt with was documents at work. | 10:36:38 |
| 21 | Q    Exhibit 3 states on the face of it that | 10:36:40 |
| 22 | it's a job description for a job title of export | 10:36:45 |
| 23 | specialist III that reports to the export | 10:36:50 |
| 24 | supervisor.  That's in the top right-hand corner -- | 10:36:52 |
| 25 | A    Yes. | 10:36:55 |

LONNIE SMITH, VOL. 1 - April 6, 2010
SMITH VS. CEVA LOGISTICS U.S., INC.

| | | | |
|---|---|---|---|
| 1 | A | No. | 11:47:05 |
| 2 | Q | People were generally able to agree on a | 11:47:06 |
| 3 | | schedule that made sense? | 11:47:09 |
| 4 | A | Yes. | 11:47:10 |
| 5 | Q | The general instruction that you received | 11:47:10 |
| 6 | | in conjunction with punching in or out was to record | 11:47:15 |
| 7 | | all of your time; correct? | 11:47:18 |
| 8 | A | Correct. | 11:47:19 |
| 9 | Q | How was that communicated to you? | 11:47:20 |
| 10 | A | Initially, when I started with the company. | 11:47:22 |
| 11 | Q | You recall reading one or more company | 11:47:27 |
| 12 | | policies regarding recording time that say "You must | 11:47:32 |
| 13 | | record all of your time that you work"? | 11:47:35 |
| 14 | A | I don't recall specifically. | 11:47:33 |
| 15 | Q | Do you generally recall coming to an | 11:47:44 |
| 16 | | understanding that such a policy existed? | 11:47:47 |
| 17 | A | Yes. | 11:47:49 |
| 18 | Q | Your supervisors, at one point or another, | 11:47:50 |
| 19 | | spoke to you about the importance of recording your | 11:47:54 |
| 20 | | time accurately; correct? | 11:47:57 |
| 21 | A | Yes. | 11:47:53 |
| 22 | Q | You recall reading policies, one or more, | 11:47:59 |
| 23 | | from the company concerning recording your time | 11:48:03 |
| 24 | | accurately at some point during your employment? | 11:48:06 |
| 25 | A | Other than my initial paperwork that I | 11:48:10 |

109

LUDWIG KLEIN REPORTERS & VIDEO, INC. - 800.540.0681

LONNIE SMITH, VOL. 1 - April 6, 2010
SMITH VS. CEVA LOGISTICS U.S., INC.

| | | |
|---|---|---|
| 1 | filled out when I got hired in with the company. | 11:48:23 |
| 2 | Q    During your employment, did you generally | 11:48:27 |
| 3 | understand that the time that you logged on the | 11:48:30 |
| 4 | timekeeping system was the basis that the company | 11:48:33 |
| 5 | used to pay you upon?  Correct? | 11:48:36 |
| 6 | A    Correct.  Yes. | 11:48:38 |
| 7 | Q    And you understood that the time you input | 11:48:39 |
| 8 | into that system, you would be paid for, and the | 11:48:41 |
| 9 | time you didn't input into that system, you wouldn't | 11:48:44 |
| 10 | be paid for; correct? | 11:48:47 |
| 11 | A    Correct. | 11:48:48 |
| 12 | Q    You understood that CEVA would look to that | 11:48:49 |
| 13 | timekeeping system as the basis for knowing when you | 11:48:53 |
| 14 | worked and when you didn't work; correct? | 11:48:56 |
| 15 | A    Correct. | 11:48:58 |
| 16 | Q    The timekeeping system, I believe you | 11:48:58 |
| 17 | testified, stayed the same from 2002 to 2008; | 11:49:02 |
| 18 | correct? | 11:49:05 |
| 19 | A    Correct. | 11:49:06 |
| 20 | Q    During your employment with CEVA, at least | 11:49:07 |
| 21 | at the outset, how often were you paid? | 11:49:11 |
| 22 | A    Biweekly. | 11:49:14 |
| 23 | Q    In conjunction with the biweekly pay, do | 11:49:21 |
| 24 | you recall having to review a printout essentially | 11:49:28 |
| 25 | of your punch-in and punch-out times? | 11:49:31 |

LONNIE SMITH, VOL. 1 - April 6, 2010
SMITH  VS. CEVA LOGISTICS U.S., INC.

| | | |
|---|---|---|
| 1 | A     Yes. | 15:25:29 |
| 2 | Q     Let's take a look at a document that we'll | 15:25:30 |
| 3 | mark as No. 10. | 15:25:36 |
| 4 | (Defendants' Exhibit 10 was marked for | 15:25:36 |
| 5 | identification by the certified shorthand reporter.) | 15:26:17 |
| 6 | BY MR. MESSIHA: | 15:26:17 |
| 7 | Q     Just take a look at that, and let me know | 15:26:17 |
| 8 | when you're done, please. | 15:26:19 |
| 9 | A     Yes. | 15:26:40 |
| 10 | Q     You recognize Exhibit 10? | 15:26:41 |
| 11 | A     Yes. | 15:26:42 |
| 12 | Q     Is that your signature there on the second | 15:26:43 |
| 13 | line above "Employee Signature"? | 15:26:46 |
| 14 | A     Yes, it is. | 15:26:48 |
| 15 | Q     Is the date that you signed this sometime | 15:26:49 |
| 16 | around July 10th of '02? | 15:26:52 |
| 17 | A     Yes. | 15:26:54 |
| 18 | Q     Which was right around the beginning of | 15:26:54 |
| 19 | your employment with EGL; correct? | 15:26:57 |
| 20 | A     Correct. | 15:26:59 |
| 21 | Q     Did you understand as -- in conjunction | 15:26:59 |
| 22 | with signing this Employee Handbook Acknowledgement, | 15:27:02 |
| 23 | that you had been given a copy of the Eagle Global | 15:27:05 |
| 24 | Logistics handbook or that it was available to you | 15:27:12 |
| 25 | on the Internet? | 15:27:14 |

LUDWIG KLEIN REPORTERS & VIDEO, INC. - 800.540.0681

209

LONNIE SMITH, VOL. 1 - April 6, 2010
SMITH  VS. CEVA LOGISTICS U.S., INC.

| | | |
|---|---|---|
| 1 | A     Yes. | 15:27:15 |
| 2 | Q     Did you in fact review either a hard copy | 15:27:15 |
| 3 | or an Internet copy of the company's policies at | 15:27:17 |
| 4 | that time? | 15:27:21 |
| 5 | A     No. | 15:27:21 |
| 6 | Q     Why not? | 15:27:21 |
| 7 | A     Just continued to do my work.  The booklet | 15:27:22 |
| 8 | was huge, about half as much as what you got right | 15:27:27 |
| 9 | there. | 15:27:32 |
| 10 | Q     Let's look at Exhibit 11.  You can set that | 15:27:33 |
| 11 | one aside. | 15:27:38 |
| 12 | (Defendants' Exhibit 11 was marked for | 15:27:38 |
| 13 | identification by the certified shorthand reporter.) | 15:27:38 |
| 14 | BY MR. MESSIHA: | 15:27:38 |
| 15 | Q     Same drill with this one.  Let me know when | 15:27:52 |
| 16 | you're done reading it. | 15:27:54 |
| 17 | A     Yes. | 15:28:06 |
| 18 | Q     You recognize this document as a | 15:28:07 |
| 19 | timekeeping policy acknowledgment? | 15:28:11 |
| 20 | A     Yes. | 15:28:14 |
| 21 | Q     Did you sign this document on the bottom on | 15:28:14 |
| 22 | or about August 20th, 2004? | 15:28:16 |
| 23 | A     Yes. | 15:28:18 |
| 24 | Q     And you did in fact receive a copy of the | 15:28:19 |
| 25 | company's timekeeping policy in conjunction with | 15:28:23 |

210

LONNIE SMITH, VOL. 1 - April 6, 2010
SMITH  VS. CEVA LOGISTICS U.S., INC.

| | | |
|---|---|---|
| 1 | signing this acknowledgment? | 15:28:26 |
| 2 | A    I believe I did. | 15:28:27 |
| 3 | Q    Did you understand at any time during your | 15:28:32 |
| 4 | employment that the company's timekeeping policy was | 15:28:37 |
| 5 | that employees should accurately record all time | 15:28:39 |
| 6 | worked? | 15:28:42 |
| 7 | A    Yes. | 15:28:43 |
| 8 | Q    You can set that one aside. | 15:28:44 |
| 9 | I'm going to move on to No. 12. | 15:28:47 |
| 10 | (Defendants' Exhibit 12 was marked for | 15:28:47 |
| 11 | identification by the certified shorthand reporter.) | 15:28:47 |
| 12 | BY MR. MESSIHA: | 15:28:47 |
| 13 | Q    Take a look at 12, and let me know when | 15:29:04 |
| 14 | you're done, please. | 15:29:07 |
| 15 | A    Yes. | 15:29:22 |
| 16 | Q    Do you recall signing Exhibit 12 sometime | 15:29:23 |
| 17 | in February of 2004? | 15:29:26 |
| 18 | A    Yes. | 15:29:28 |
| 19 | Q    And Exhibit 12 is an acknowledgment of your | 15:29:28 |
| 20 | receipt of the company's employee handbook; correct? | 15:29:34 |
| 21 | A    Correct. | 15:29:37 |
| 22 | Q    And it says up there at the first sentence: | 15:29:37 |
| 23 | "I hereby acknowledge that I have received | 15:29:39 |
| 24 | and read the contents of the EGL, Inc. | 15:29:41 |
| 25 | Employee Handbook for USA Employees." | 15:29:44 |

LONNIE SMITH, VOL. 1 - April 6, 2010
SMITH VS. CEVA LOGISTICS U.S., INC.

1          Do you see that?                              15:29:49

2     A    Yes.                                          15:29:49

3     Q    And had you in fact received and read the     15:29:49

4 contents of the EGL, Inc. Employee Handbook?           15:29:54

5     A    No, I did not read it.                        15:29:56

6     Q    Did you read any part of it?                  15:29:58

7     A    No.                                           15:29:59

8     Q    But you were provided it?                     15:30:01

9     A    Yes.                                          15:30:03

10    Q    You can set that one aside.                   15:30:01

11         Look at 13.  Let me know when you've had a    15:30:18

12 chance to look at 13.                                 15:30:33

13         (Defendants' Exhibit 13 was marked for        15:30:22

14 identification by the certified shorthand reporter.)  15:30:22

15         THE WITNESS:  Yes.                            15:30:33

16 BY MR. MESSIHA:                                       15:30:34

17    Q    Do you recall signing this Acknowledgement    15:30:14

18 of Receipt of 2005 Employee Handbook?                 15:30:33

19    A    Yes.                                          15:30:40

20    Q    And do you recall signing this                15:30:40

21 acknowledgment sometime in March of 2005?             15:30:43

22    A    Yes.                                          15:30:46

23    Q    And similar to the 2004 acknowledgment,       15:30:46

24 this form says in the first sentence:                 15:30:50

25         "I hereby acknowledge that I have received    15:30:52

LONNIE SMITH, VOL. 1 - April 6, 2010
SMITH VS. CEVA LOGISTICS U.S., INC.

| | | | |
|---|---|---|---|
| 1 | | and read the contents of the Eagle Global | 15:30:55 |
| 2 | | Logistics Employee Handbook for USA | 15:30:59 |
| 3 | | Employees.  I fully understand the contents | 15:31:00 |
| 4 | | of this handbook and will clarify any | 15:31:03 |
| 5 | | questions or concerns with my immediate | 15:31:05 |
| 6 | | Manager or the Human Resources Department." | 15:31:09 |
| 7 | | Do you see that? | 15:31:12 |
| 8 | A | Yes. | 15:31:13 |
| 9 | Q | And did you in fact receive and read the | 15:31:13 |
| 10 | | contents of the Eagle Global Logistics Employee | 15:31:16 |
| 11 | | Handbook -- | 15:31:20 |
| 12 | A | I did not read it. | 15:31:20 |
| 13 | Q | -- sometime in '05? | 15:31:22 |
| 14 | | I'm sorry? | 15:31:24 |
| 15 | A | Did not read it. | 15:31:24 |
| 16 | Q | Why not? | 15:31:25 |
| 17 | A | Once again, it was too thick.  I had | 15:31:26 |
| 18 | | house-airway-bill shipments to process, take too | 15:31:30 |
| 19 | | much time to read these. | 15:31:34 |
| 20 | Q | But you were provided a copy of it? | 15:31:35 |
| 21 | A | Yes. | 15:31:37 |
| 22 | Q | Did your understanding of the company's | 15:31:37 |
| 23 | | timekeeping policy remain the same in 2005 as it had | 15:31:40 |
| 24 | | been prior? | 15:31:44 |
| 25 | A | Yes. | 15:31:45 |

213

LONNIE SMITH, VOL. 1 - April 6, 2010
SMITH VS. CEVA LOGISTICS U.S., INC.

1    Q    Let's look at Exhibit 14.                              15:31:46

2         (Defendants' Exhibit 14 was marked for                15:31:46

3    identification by the certified shorthand reporter.)        15:31:46

4         THE WITNESS:  That's not my signature.                15:32:10

5    BY MR. MESSIHA:                                             15:32:10

6    Q    Did you ever -- do you recall ever seeing             15:32:22

7    this form before?                                           15:32:23

8    A    I did not sign this.  I don't recall this.            15:32:25

9    Q    You don't recall seeing it at all?                    15:32:27

10   A    No.                                                    15:32:29

11   Q    Did you -- do you know who may have signed            15:32:30

12   it?                                                         15:32:33

13   A    No.                                                    15:32:33

14   Q    That's not your signature there?                      15:32:34

15   A    No, it's not.                                          15:32:36

16   Q    Do you recognize the writing there?                   15:32:37

17   A    No.                                                    15:32:39

18   Q    This will be 15.                                      15:32:47

19        (Defendants' Exhibit 15 was marked for                15:32:47

20   identification by the certified shorthand reporter.)        15:32:47

21        THE WITNESS:  Okay.                                   15:33:39

22   BY MR. MESSIHA:                                             15:33:39

23   Q    Have you seen Exhibit 15 before?                      15:33:39

24   A    Yes.                                                   15:33:41

25   Q    Is that your signature at the bottom?                 15:33:41

LONNIE SMITH, VOL. 1 - April 6, 2010
SMITH VS. CEVA LOGISTICS U.S., INC.

1    A    Yes.                                                    15:33:43

2    Q    Or where it says "Signature," at any rate?             15:33:46

3    A    Yes.                                                    15:33:49

4    Q    And this form, again, similar to the                   15:33:50

5    others, says:                                               15:33:54

6         "I hereby acknowledge that I have received             15:33:54

7         and read the contents of the Eagle Global              15:33:56

8         Logistics USA Employee Handbook and Code of            15:34:01

9         Conduct."                                              15:34:03

10        Do you see that?                                       15:34:03

11   A    Yes.                                                    15:34:04

12   Q    Did you in fact receive the Eagle Global               15:34:04

13   Logistics USA Employee Handbook at about the time           15:34:10

14   you signed this acknowledgment?                             15:34:13

15   A    Yes.                                                    15:34:15

16   Q    Did you read the handbook at that time?                15:34:15

17   A    No.                                                     15:34:17

18   Q    Same reason as before?                                 15:34:17

19   A    Yes.                                                    15:34:21

20   Q    Let's look at what will be Exhibit 16.                 15:34:22

21        (Defendants' Exhibit 16 was marked for                 15:34:22

22   identification by the certified shorthand reporter.)        15:34:22

23   BY MR. MESSIHA:                                             15:34:22

24   Q    Have you had a chance to look at                       15:38:03

25   Exhibit 16?                                                 15:38:05

LONNIE SMITH, VOL. 1 - April 6, 2010
SMITH VS. CEVA LOGISTICS U.S., INC.

| | | |
|---|---|---|
| 1 | A      Yes. | 15:38:06 |
| 2 | Q      And I'll actually draw your attention to | 15:38:07 |
| 3 | one portion of Exhibit 16, which begins on the | 15:38:10 |
| 4 | sixth page of the exhibit.  It's actually marked as | 15:38:14 |
| 5 | page No. 1, but it's Revision No. 4 to the policy. | 15:38:18 |
| 6 | And the revision number's indicated in the top | 15:38:25 |
| 7 | right-hand corner. | 15:38:28 |
| 8 | Do you see that, where it says | 15:38:29 |
| 9 | "Revision...4"? | 15:38:30 |
| 10 | A      Yes. | 15:38:31 |
| 11 | Q      And you're on page No. 1 of Exhibit 4? | 15:38:32 |
| 12 | A      Yes. | 15:38:36 |
| 13 | Q      Or page No. 1 of Revision 4?  Sorry. | 15:38:36 |
| 14 | A      Right. | 15:38:40 |
| 15 | Q      Have you seen any of these policies before | 15:38:41 |
| 16 | as part of the handbooks that you were provided in | 15:38:45 |
| 17 | your employment? | 15:38:48 |
| 18 | A      I didn't read the handbooks, so I haven't | 15:38:49 |
| 19 | read this. | 15:38:53 |
| 20 | Q      The first sentence of the Working Hours, | 15:38:54 |
| 21 | slash, Operations policy regarding timekeeping | 15:38:59 |
| 22 | states that: | 15:39:03 |
| 23 | "It is the policy and practice of CEVA to | 15:39:03 |
| 24 | accurately compensate employees and to do | 15:39:06 |
| 25 | so in compliance with all applicable state | 15:39:08 |

216

LONNIE SMITH, VOL. 1 - April 6, 2010
SMITH VS. CEVA LOGISTICS U.S., INC.

| | | |
|---|---|---|
| 1 | and federal laws." | 15:39:11 |
| 2 | Do you see that? | 15:39:13 |
| 3 | A     Yes. | 15:39:13 |
| 4 | Q     Did you understand that to be the policy in | 15:39:13 |
| 5 | effect regarding timekeeping during your employment | 15:39:16 |
| 6 | with CEVA? | 15:39:18 |
| 7 | A     Yes. | 15:39:19 |
| 8 | Q     Moving to paragraph 2, which is Review of | 15:39:19 |
| 9 | the Pay Stub, fourth sentence there, it says: | 15:39:23 |
| 10 | "Employees are tasked with reviewing their | 15:39:28 |
| 11 | pay stub upon receipt to ensure that it is | 15:39:31 |
| 12 | correct.  If an employee believes that a | 15:39:33 |
| 13 | mistake has occurred or if there are any | 15:39:37 |
| 14 | questions, they should immediately avail | 15:39:39 |
| 15 | themselves of the reporting procedure | 15:39:41 |
| 16 | outlined below." | 15:39:45 |
| 17 | Do you see that? | 15:39:46 |
| 18 | A     Yes. | 15:39:46 |
| 19 | Q     And you did in fact, at least on one | 15:39:47 |
| 20 | occasion, bring an issue regarding your pay to | 15:39:49 |
| 21 | Chantrial White; correct? | 15:39:56 |
| 22 | A     Yes. | 15:39:56 |
| 23 | Q     And so you were familiar at least somewhat | 15:39:57 |
| 24 | with this policy during your employment; correct? | 15:40:00 |
| 25 | A     Yes. | 15:40:02 |

```
 1                REPORTER'S CERTIFICATE

 2

 3          I, Kristin L. Mattsen, CSR No. 12897, a

 4   Certified Shorthand Reporter in and for the State of

 5   California, do hereby certify:

 6          That prior to being examined, the witness named

 7   in the foregoing proceedings declared under penalty of

 8   perjury to testify to the truth, the whole truth,

 9   and nothing but the truth;

10          That said proceedings were taken by me in

11   shorthand at the time and place herein named and were

12   thereafter transcribed into typewriting under my

13   direction, said transcript being a true and correct

14   transcription of my shorthand notes;

15          Pursuant to Federal Rule 30(e), transcript

16   review was requested;

17          I further certify that I have no interest in

18   the outcome of this action.

19

20          April 19, 2010

21

22          _____

             Kristin L. Mattsen
23           CSR No. 12897

24

25
```

270

# EXHIBIT C

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

**CERTIFIED COPY**

LONNIE R. SMITH, individually and
on behalf of all others similarly
situated,

                    Plaintiffs,

    vs.

CEVA LOGISTICS U.S., INC.; a
Delaware corporation; CEVA FREIGHT
MANAGEMENT INTER-NATIONAL GROUP,
INC., a Delaware corporation; CEVA
FREIGHT, LLC, a Delaware limited
liability company; EGL EAGLE
GLOBAL LOGISTICS, LP, a Delaware
limited partnership; and DOES 1
through 200, inclusive,

                  Defendants.

Case No. CV 09-4957
CAS (RCx)

DEPOSITION OF:   DENISE MOORE

TAKEN ON:       APRIL 7, 2010

**SCR**

**STRONG COURT REPORTING**

Certified Shorthand Reporters

18688 San Felipe Street • Fountain Valley, CA 92708
Phone 714.593.4042 • Fax 714.968.0808
StrongCourtReporting@msn.com

REPORTED BY:                        FILE NO:

    Lorene Fay Strong, CSR No. 5579       10168

1    employee's record.

2        Q    Is that sometimes known as an override?

3        A    I've never called it that, but --

4        Q    In your experience what kinds of entries does a

5    timekeeper typically make to the employee's time and

6    attendance records in Kronos?

7        A    If they forget to punch in at any interval

8    through the day, they would enter that from a form

9    that's signed and received.  Sometimes people double

10   punch, so it's to remove an extra punch.  They would

11   record vacation time that was taken by the associate.

12   They would record sick time that was taken by the

13   associate.

14       Q    Okay.

15       A    They would record jury service time, personal

16   holiday time.

17       Q    Anything else?

18       A    Bereavement time.

19       Q    How many locations --

20       A    I'm sorry.  And they would record time and a

21   half if an associate worked on a company observed

22   holiday.

23       Q    Would you please name the California facilities

24   in which CEVA utilizes the Kronos system.

25       A    Los Angeles, San Diego, Ontario, San Francisco.

17

1     Q     Is there a Sacramento facility?

2     A     Sacramento.  And that's all I can think of.

3     Q     Does each of the locations that you've named

4  have a timekeeper?

5     A     Yes.

6     Q     And do the timekeepers perform the same

7  function in each of those locations?

8     A     Yes.

9     Q     And is the interface between the Kronos system

10  and the employees the same in all of those locations?

11     A     Yes.

12     Q     So that the procedure that you've described

13  where the employee arrives and clocks in with Kronos and

14  the other interactions during the day would be the same

15  regardless of what location in California we're talking

16  about?

17     A     Right.

18     Q     And that would be true since you started in

19  2001 in your position?

20     A     Correct.

21     Q     Are there any deviations from the procedures

22  that you've described that you're aware of occurring in

23  any of the California locations since you started in

24  2001?

25     MR. MESSIHA:  Objection.  It's vague and ambiguous

                                                    18

1    as to deviations.

2            You can answer if you understand it.

3       THE WITNESS:  Deviations, I guess with regards to

4    what I list what timekeepers do?

5    BY MR. CAGNEY:

6       Q    No.  I'm talking now about how the employees

7    interact with Kronos, is it the same throughout all the

8    locations in California?

9       A    It's the same procedure, yes.

10      Q    And have there any -- strike that.

11           Have there been any periods that you know of

12   when employees used some different procedures at one or

13   more of the locations in California than those that

14   you've described?

15      A    Not that I'm aware of.

16      Q    Your facility -- strike that.

17           Your office is in Brisbane, California?

18      A    Uh-huh.

19      Q    And do you -- strike that.

20           Does the company employ any nonexempt export

21   agents at that location?

22      A    In Brisbane?

23      Q    Yes.

24      A    I don't believe we have any export in Brisbane.

25      Q    What's the nature of the Brisbane facility?

19

STRONG COURT REPORTING

1      A      Brisbane mainly handles paper transactions,

2   brokerage, global account sales, Eagle trade services.

3   There's an accounting department there.

4          MR. MESSIHA:  I'm sorry, Denise, I'm having a little

5   bit of trouble hearing you.  Try to keep your voice

6   up --

7          THE WITNESS:  Sorry.

8          MR. MESSIHA:  -- so the reporter can get you.

9          THE WITNESS:  I'm sorry.  Are you having trouble

10   hearing me?

11          THE REPORTER:  I'm fine.

12          THE WITNESS:  I believe that's all the functions

13   that are there.

14   BY MR. CAGNEY:

15      Q      On a day-to-day basis, what is the nature of

16   your interaction, if any, with the Kronos system?

17      A      I wouldn't say I have a day-to-day use for it.

18      Q      On those occasions when you do interact with

19   the Kronos system, what is your purpose or what are the

20   purposes for which you undertake that activity?

21      A      I may run a punch detail report from there.

22      Q      What is a punch detail report?

23      A      It details from the timeframe that you name if

24   you want to look at the -- I use it to look at

25   attendance for a particular employee if I have a

                                                        20

REPORTER'S CERTIFICATION

1
2
3
4

5   I, ___Lorene Fay Strong___, Certified

6   Shorthand Reporter No. 5579 , for the State of

7   California, do hereby certify:

8        That, prior to being examined, the witness

9   named in the foregoing deposition, to wit,

10   DENISE MOORE , was by me duly sworn to testify the

11   truth, the whole truth and nothing but the truth;

12        That said deposition was taken down by me

13   stenographically at the time and place herein named and

14   thereafter reduced to transcription under my direction;

15   that the foregoing is a true record of the testimony and

16   proceedings taken at that time.

17        I further certify that I am not interested in

18   the event of the action.

19        Witness my hand this ___21st___ day of

20   ___April___, 2010.

21
22
23   _____
     Certified Shorthand Reporter
24
25

90

# EXHIBIT D

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

LONNIE R. SMITH, individually and
on behalf of all others similarly
situated,

                 Plaintiffs,

    vs.

CEVA LOGISTICS U.S., INC.; a
Delaware corporation; CEVA FREIGHT
MANAGEMENT INTER-NATIONAL GROUP,
INC., a Delaware corporation; CEVA
FREIGHT, LLC, a Delaware limited
liability company; EGL EAGLE
GLOBAL LOGISTICS, LP, a Delaware
limited partnership; and DOES 1
through 200, inclusive,

                Defendants.

Case No. CV 09-4957
CAS (RCx)

**CERTIFIED COPY**

DEPOSITION OF:   <u>RAMIRO REYNA</u>

TAKEN ON:       APRIL 8, 2010



SCR
STRONG COURT REPORTING

Certified Shorthand Reporters

n Felipe Street • Fountain Valley, CA 92708
hone 714.593.4042 • Fax 714.968.0808
StrongCourtReporting@msn.com



RECEIVED

APR 2 6 2010

rene Fay Strong, CSR No. 5579

FILE NO:

10170

1    Q     Let's go to Cell C-1.  Do you know what that

2    information is?

3    A     Yes.

4    Q     What is that?

5    A     That is a field that contains the branch, the

6    company, the application and the file number.  It's more

7    a -- when Rick goes in and enters a shipment or some

8    information into the system, you look at it as a -- it's

9    termed a file.  I use the term file because that's what

10   the application refers to.  So this file is created for

11   let's say a particular customer to ship a certain bit or

12   pieces of physical stuff.  Since Rick works at LAX, 01

13   refers to the company, 05 refers to the branch, AE

14   refers to the export piece, and the file number that was

15   generated, system generated, that pertains to that

16   particular shipment.  So that way there's various ways

17   to look at the information that Rick keyed in, or

18   anybody keyed in, and retrieve the full information of

19   that particular shipment.

20   Q     And the application generated file number would

21   be the 425 --

22   A     04256715.

23   Q     Let's go to Column D and look at Cell No. 1.

24   What's that information?

25   A     That probably is the branch, which is -- you'll

                                                          38

REPORTER'S CERTIFICATION

I, ____Lorene Fay Strong____, Certified Shorthand Reporter No. 5579 , for the State of California, do hereby certify:

That, prior to being examined, the witness named in the foregoing deposition, to wit, RAMIRO REYNA , was by me duly sworn to testify the truth, the whole truth and nothing but the truth;

That said deposition was taken down by me stenographically at the time and place herein named and thereafter reduced to transcription under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

I further certify that I am not interested in the event of the action.

Witness my hand this ____22nd____ day of ____April____, 2010.

_____
Certified Shorthand Reporter

99

STRONG COURT REPORTING

# DECLARATION OF EDUARDO MORA

## DECLARATION OF EDUARDO MORA

I, Eduardo Mora, do hereby swear, affirm and attest as follows, based upon my personal knowledge of the matters contained herein:

1.   I am over 18 years of age and competent to testify to the matters stated in this declaration. I make this declaration based upon my personal knowledge.

2.   I am currently employed by CEVA Freight, LLC ("the Company") as an Operations Specialist IV in Torrance, California. I have been an employee of the Company or its predecessor entities for approximately 13 years. I have also held the positions of Export Specialist and Export Specialist Supervisor, and have also worked at the Company's facilities in Hawthorne and Englewood, California. However, I have been working from the Company's Torrance location for approximately the last 7 years. As an Operations Specialist IV my duties primarily consist of managing the logistics of package shipments around the world.

3.   In my 13 years with the Company, I have never held the title of "Freight Forwarder," nor am I aware of any other employee within the Company who has held this title. Although the Company is in the business of freight forwarding, to my knowledge, this is not an actual job title.

4.   I currently work at the Company's Torrance facility located at 19600 Western Ave., Torrance, California 90501. My typical work schedule is Monday through Friday, from 7:00 a.m. to 4:00 p.m.

5.   My current supervisor is Eddie Centeno. Over the course of my employment with the Company, I have also been supervised by Camille Utter, John McDonald and Steve Arthur.

6.   When I was hired by the Company, I received an Employee Handbook ("handbook"), which I reviewed. The handbook contains the Company's various policies, including its meal break policy and rest break policies. I believe the Company's policies can also be found on the Company's intranet website.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2049 Century Park East
5th floor
Los Angeles, CA 90067 3107

1.

DECLARATION OF EDUARDO MORA

7.      Based on my review of the handbook, trainings I have received, and discussions with Human Resources ("HR"), I am aware of the meal and rest break policies at the Company.  Specifically, I have been informed on multiple occasions by HR that I am required to take my lunch break within the first 5 hours of starting my shift.  I am also aware that I am entitled to 2 separate 15 minute rest breaks every day that I work.

8.      During my employment with the Company I have almost always taken a one hour lunch break every day.  About half of the time I will bring some food from home and eat in the break room.  The other half of the time, I usually go out to a restaurant with my co-workers and get something to eat.  On average, I would estimate that I skip my lunch break 1-2 times per year, for personal reasons.  Usually, I skip my lunch break when I need to leave work a little early and have something that I need to get done.  In every instance in which I have skipped my lunch, it has been entirely my own choice, and none of my supervisors or managers have ever asked me to skip my lunch break.

9.      On those few occasions where I have skipped m lunch break, I was required to complete, and did complete, a missed meal period authorization form.  On each occasion, I submitted it to my supervisor or manager who approved it.  Additionally, I have always been compensated for the time that I spent working through my meal period, as I did not clock out during this time.

10.     At no time have I ever been told by any of my supervisors, managers, or anyone else at the Company, that I could not take a meal period.  On every occasion where I did not take a meal period, it was my always my own choice.

11.     In addition to my meal period, I am also aware that I am entitled to 2 separate 15 minute breaks each day that I work.  As I mentioned, I learned about this policy in the Company's handbook, in addition to discussions with my supervisors and HR.  Specifically, I can recall my former supervisor, Camille Utter, reminding me on more than one occassion that I need to take my rest breaks.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2049 Century Park East
5th Floor
Los Angeles, CA  90067 3107

2.

DECLARATION OF EDUARDO MORA

1    12.    Typically, I do not take my rest breaks, however, this is my own

2  choice.  I generally will not take my rest breaks because I do not have any desire to

3  take my rest breaks.  None of my supervisors, managers, or anyone else at the

4  company has ever told me or asked me to skip my rest breaks.

5    13.    During my employment with the Company, I have understood that

6  I am required to accurately record the start and end of my workday, and I do so in our

7  computer program called Kronos.  In addition to recording the start and end of my

8  workday,  I also record the time that I clock out for lunch and also when I clock back

9  in.

10    14.    I routinely review my time records for each pay period to ensure

11  they are accurate. I am required to sign a certification stating that all the hours I have

12  entered are accurate before they are submitted to payroll.   I cannot recall any

13  instances where my time records were inaccurate, as I generally check my time

14  records every day before going home.

15    15.    On average, I would estimate that I work approximately 3 hours

16  per week in overtime.  Although it is sometimes necessary to get pre-authorization to

17  work this overtime, other times the Company knows that we are busy and it doesn't

18  require us to obtain this pre-authorization.  I have always been paid for all overtime

19  hours which I have worked, and to my knowledge, I have always been paid correctly

20  for this time worked.  I have never been disciplined for working overtime without first

21  obtaining pre-authorization, however on certain occasions, I have been told that I need

22  to obtain pre-authorization before working overtime.

23    16.    I also understand that "off-the-clock" work is strictly prohibited

24  (i.e., work without reporting any time worked on my time records).  I have never

25  performed any off-the-clock work since being employed with the Company, nor have

26  any of my managers, supervisors, or other employees of the Company ever asked me

27  to work off the clock.

28

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067 3107

3.

DECLARATION OF EDUARDO MORA

1         17.    I have provided this declaration voluntarily.  I was not promised

2  any benefit, nor threatened in any way, in exchange for the testimony I have provided

3  in this declaration.  Prior to signing this declaration, I was provided with a full

4  opportunity to carefully review this declaration and freely make any corrections and

5  additions of any kind.  I verify that the information I have provided in this declaration

6  is true and correct.

7         I declare under penalty of perjury under the laws of the United States and

8  the State of California that the foregoing is true and correct.

9         Executed this _1st_ day of _July_ , 2010, at _Torrance_, California.

10

11                                       Eduardo Mora

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2049 Century Park East
5th Floor
Los Angeles, CA 90067.3107

4.

DECLARATION OF EDUARDO MORA

# DECLARATION OF FEDELIO ADRIANO

## DECLARATION OF FIDELIO ADRIANO

I, Fidelio Adriano, do hereby swear, affirm and attest as follows, based upon my personal knowledge of the matters contained herein:

1. I am over 18 years of age and competent to testify to the matters stated in this declaration. I make this declaration based upon my personal knowledge.

2. I am currently employed by CEVA Freight, LLC ("the Company") as a Data Entry, Operations Specialist in Heyward, California. I have been an employee of the Company or its predecessor entities for approximately 2 years.

3. As Data Entry Operations Specialist my duties included verifying shipping addresses on movement order shipping slips, entering shipping information where it is absent in the computer records, and printing shipping labels to be used in freight shipping.

4. I currently work at the Company's SFO Facility located at 30750 Wiegman Road, Hayward, California 94544, from Monday through Friday. My shift typically starts at 5:30 p.m. and ends at ~~1:30 a.m.~~ 2:00 FA

5. My current supervisor is Jeff Peters. He has been my only supervisor during my employment with the Company.

6. When I was hired by the Company, I received an Employee Handbook ("handbook"). The handbook contained the Company's various policies. These policies can also be found on the Company's intranet website. After I received the handbook, I reviewed the various policies contained in it.

7. Based on my review of the handbook and based on trainings and information shared with me throughout my employment with the Company, I am familiar with the Company's meal period and rest break policies and policies regarding accurately recording my time.

8. With regard to meal periods, I have understood throughout my employment that I have been permitted to take an unpaid meal period of at least 30 minutes during each of my shifts.

1.

DECLARATION

9.      During my employment with the Company I have always taken my unpaid meal period, usually after four hours into my shift.    I typically eat my lunch onsite, although I eat offsite about once a week, at local restaurants near the SFO location.

10.     I have never had to use a Missed Meal Period Authorization Form, but I understand that they are available if I choose not to take my unpaid meal break.

11.     At no time was I ever told by any of my supervisors, or anyone else at the Company, that I could not take a meal period.

12.     Based on my review of the handbook and other training and communications I received during my employment, I also understood that I was permitted to a paid rest break of fifteen minutes for each four hours worked.

13.     During my employment with the Company I have always taken my rest period, usually one before and one after the lunch break.  I typically use the rest break to take a nap or read in my car.

14.     If I did not take a rest break, it was my own personal choice.

15.     At no time during my employment with the Company was I ever told by any of my supervisors, or anyone else at the Company, that I could not take the rest breaks permitted me by the Company.

16.     During my employment with the Company, I have understood that I am required to accurately record the start and end of my workday by punching in when I arrive and punching out when I leave.  I am also required to accurately record when I take my meal period by clocking in and out before and after my meal break.  I also understand that "off-the-clock" work is strictly prohibited (i.e., work without reporting any time worked on my time records).

17.     There have, however, been occasions when I forgot to punch in or out. When this happened, I submit a missed punch slip.  My supervisor, Jeff Peters, then approves the missed punch slip.  My manager has never refused to correct my time punches or to compensate me for all of the hours I worked.

2.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2049 Century Park East
5th Floor
Los Angeles, CA 90067-3107
310.553.0308

18.    Additionally, I routinely review my time records for each pay period to ensure they are accurate. I have never located any error in my time.

19.    The Company has always paid me accurately for the all the time I worked.

20.    To the best of my recollection, I have never worked overtime in my two years at the Company.

21.    As part of my job as a Data Entry Operations Specialist, I enter shipping transactions on the Company's computer systems. I am informed that some of these electronic transaction records suggest that someone with my user identification entered transactions during hours when I was not punched in on CEVA's timekeeping system.

22.    During my employment with CEVA, I have not worked while off the clock. I do not have a specific recollection of the day of work, or of the times or transactions stated in these records, but to the best of my recollection, I did not enter them. I do not have an explanation for how these records were created, but I do not believe that I entered them.

23.    I have provided this declaration voluntarily. I was not promised any benefit, nor threatened in any way, in exchange for the testimony I have provided in this declaration. Prior to signing this declaration, I was provided with a full opportunity to carefully review this declaration and freely make any corrections and additions of any kind. I verify that the information I have provided in this declaration is true and correct.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed this 11 day of May, 2011, at Hayward, California.

FIDELIO ADRIANO

3.

DECLARATION

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2049 Century Park East
5th Floor
Los Angeles, CA 90067-3107
310.553.0308

# DECLARATION OF OSCAR AVENDANO

## DECLARATION OF OSCAR AVENDANO

I, Oscar Avendano, do hereby swear, affirm and attest as follows, based upon my personal knowledge of the matters contained herein:

1.    I am over 18 years of age and competent to testify to the matters stated in this declaration. I make this declaration based upon my personal knowledge.

2.    I am currently employed by CEVA Freight, LLC ("the Company") as a Gateway Specialist in Torrance, California. I have been an employee of the Company or its predecessor entities for approximately 17 years. I began my employment with Circle International in 1993 as a Gateway Specialist. In approximately 2000 I went to work for EGL Eagle Global Logistics, LP ("EGL"), as a Gateway Specialist, when EGL took over Circle International. In approximately 2007, the Company took over EGL and kept me on as a Gateway Specialist. I am currently by the Company as a Gateway Specialist.

3.    As a Gateway Specialist, I confirm whether an airline has space to book our cargo and I also request "spot rates" from the airlines, which may be better than our contracted rates with the airline. I also close the consolidations, which means that I place all of the shipments for one destinations under one master airway bill. I also answer emails from feeder stations regarding rates and flight information.

4.    I have never held the title of "Freight Forwarder," nor am I aware of any other employee within the Company who has.

5.    I currently work at the Company's LAX facility located at 19600 Western Ave., Torrance, California 90501. I have worked at this location since 2000.

6.    My workweek schedule is from Tuesday through Saturday. My shift typically starts at 6:00 a.m. and ends at 3:00 p.m. I changed to my current work schedule approximately 2 – 3 months ago. Previously, I worked the same days, however, my shift started at 7:00 a.m. and ended at 4:00 p.m.

7.    My current supervisor is Greg Satele. Mr. Satele has supervised me for approximately 5 years.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2049 Century Park East
5th Floor
Los Angeles, CA 90067 3107

Case 2:09-cv-04957-CAS-SS   Document 44-1   Filed 05/20/11   Page 93 of 115   Page ID
#:1801
Case 2:09-cv-04957-CAS-RC   Document 24-2   Filed 07/26/10   Page 80 of 100   Page ID
#:1025

8.      Over the course of my employment with the Company, I have also been supervised by Eddie Centeno and Glen Alexander.

9.      When I was hired by the Company, I received an Employee Handbook ("handbook"). I receive a new handbook every year. When I receive my new handbook I sign an acknowledgement form confirming I received the handbook.

10.     The handbook contains the Company's various policies. These policies can also be found on the Company's intranet website. Every year after I receive the handbook, I typically generally review the various policies contained in it.

11.     Based on my review of the handbook and based on trainings and information shared with me throughout my employment with the Company, I am familiar with the Company's meal period and rest break policies and time recording policies.

12.     With regard to meal periods, I have understood throughout my employment that I am permitted to take an unpaid meal period of at least 30 minutes during each of my shifts. Usually, my meal period lasts an hour.

13.     During my employment with the Company I have always taken my unpaid meal period within the first five hours from arriving at work. On rare occasions, I take less than a full hour. However, I have never taken a meal period that is shorter than 30 minutes. I have also never been interrupted during my meal period.

14.     Half of the time, when I bring my lunch, I take my meal period in the Company's lunch room. The other half of the time, I take my meal period offsite and go to a local restaurant, such as Peruvian restaurant, located on Artesia Blvd., called El Pollo Inca.

15.     At no time was I ever told by any of my supervisors, or anyone else at the Company, that I could not take a meal period. Nor has anyone at the Company ever requested that I work through my meal period.

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067-3107

2.

DECLARATION

Case 2:09-cv-04957-CAS-SS   Document 44-1   Filed 05/20/11   Page 94 of 115   Page ID
#:1802
Case 2:09-cv-04957-CAS-RC   Document 24-2   Filed 07/26/10   Page 81 of 100   Page ID
#:1026

1       16.     Based on my review of the handbook and other training and

2    communications I received during my employment, I also understood that I was

3    permitted to a paid rest break of 15 minutes for each 4 hours worked.

4       17.     Although the Company permits me to take a 15 minute rest break

5    for every 4 hours worked, I choose not take my rest breaks.

6       18.     I choose not to take my rest breaks, because I love what I do, and I

7    enjoy working.

8       19.     However, if I wanted to take my rest breaks, I could do so.  Even

9    though I choose not to take my rest breaks, my supervisors still continue to encourage

10    me to take my rest breaks.

11       20.     My decision not to take my rest breaks is my own personal choice.

12       21.     At no time during my employment with the Company was I ever

13    told by any of my supervisors, or anyone else at the Company, that I could not take

14    the rest breaks permitted me by the Company.

15       22.     During my employment with the Company, I have understood that

16    I am required to accurately record the start and end of my workday by logging in-and-

17    out at the computer assigned to me.  I am also required to accurately record when I

18    take my meal period by logging in-and-out.  I also understand that "off-the-clock"

19    work is strictly prohibited (i.e., work without reporting any time worked on my time

20    records).

21       23.     There have, however, been rare occasions when I forgot to log in

22    or out. When this happened, I submit a missed punch slip form to supervisor.   My

23    supervisor then approves the missed punch slip.  My supervisor has never refused to

24    correct my time punches and the Company has never refused to compensate me for all

25    of the hours I worked.

26       24.     Additionally, I routinely review my time records for each pay

27    period to ensure they are accurate.  I have on occasion seen that I forgot to log in or

28

3.

DECLARATION

1   out.   When I locate my error, I again submit a missed punch slip form to my
2   supervisor and the Company then corrects my error and pays me for the time worked.

3      25. The Company has always paid me accurately for the all the time I
4   worked.

5      26. I have on occasion worked overtime while employed by the
6   Company.

7      27. Whether and when I work overtime is determined entirely by my
8   workload on a given day, by the particular account I was working on and any
9   particular exigent circumstances or other time requirements.

10      28. I typically work overtime approximately 3 hours every pay period.
11   The Company requires that I request to work overtime. If my workload requires
12   overtime, I ask my supervisor, Mr. Satele, whether I may work overtime. Mr. Satele
13   has never denied my request to work overtime.

14      29. After working overtime, I complete an overtime authorization slip
15   and submit it to Mr. Satele who signs the slip and forwards Patricia Shinn, who
16   verifies the time records.

17      30. The Company has always paid me accurately for any overtime I
18   worked. The Company has never requested nor have I ever felt or been pressured to
19   work off-the-clock.

20
21
22
23
24
25
26
27
28

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067.3107

4.

DECLARATION

Case 2:09-cv-04957-CAS-SS   Document 44-1   Filed 05/20/11   Page 96 of 115   Page ID
#:1804
Case 2:09-cv-04957-CAS-RC   Document 24-2   Filed 07/26/10   Page 83 of 100   Page ID
#:1028

1      31.    I have provided this declaration voluntarily.  I was not promised

2   any benefit, nor threatened in any way, in exchange for the testimony I have provided

3   in this declaration.   Prior to signing this declaration, I was provided with a full

4   opportunity to carefully review this declaration and freely make any corrections and

5   additions of any kind.  I verify that the information I have provided in this declaration

6   is true and correct.

7          I declare under penalty of perjury under the laws of the United States and

8   the State of California that the foregoing is true and correct.

9          Executed this _01_ day of _July_, 2010, at _Torrance,_ California.

10

11                                              _[signature]_

12                                              Oscar Avendano

13

14

15   C:\Documents and Settings\anayebdadash\Desktop\Blitz Declaration Template (FINAL).doc

16

17

18

19

20

21

22

23

24

25

26

27

28

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067-3107

DECLARATION

# DECLARATION OF MARYESTER BALO

## DECLARATION OF MARYESTER BALO

I, Maryester Balo, do hereby swear, affirm and attest as follows, based upon my personal knowledge of the matters contained herein:

1.     I am over 18 years of age and competent to testify to the matters stated in this declaration. I make this declaration based upon my personal knowledge.

2.     I am currently employed by CEVA Freight, LLC ("the Company") as an Import Specialist in Torrance, California. I have been an employee of the Company or its predecessor entities for approximately 14 years. I first started working for ALROD in 1996 as a Gateway Supervisor. In 1998, ALROD was purchased by Circle. I began as a Gateway Supervisor with Circle and was transferred to Air Exports, Customer Service where my title changed to Export Specialist IV. In approximately 2000, EGL Eagle Global Logistics, LP, ("EGL") purchased Circle. I was retained by EGL as an Air Exports, Customer Service employee and my title remained Export Specialist IV. In approximately 2007, CEVA bought EGL and I remained in Air Exports, Customer Service until September 2009 when I was promoted to Import Specialist. I am currently an Import Specialist.

3.     As an Import Specialist, my duties include responsibility for the Interbranch, which requires that I ensure each shipment is billed and attached to the proper file. I also process the arrival of shipments and make sure that each file is open and the documents necessary to process and clear customs are complete and placed in the proper processing rack.

4.     My duties as an Export Specialist IV varied greatly from my current position. As an Export Specialist IV, I was responsible for four (4) regions and four (4) assembly accounts. The regions included Asia, Canada, Australia and New Zealand.

5.     An assembly account is multiple vendor accounts for one destination. The assembly accounts I was responsible for included "Cherokee," "Shock Records," "Highland Quilt," and "Tyco Asia." Typically, I would receive an

1.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2049 Century Park East
5th Floor
Los Angeles, CA 90067-3107

1   email from overseas or a local vendor and schedule a pick up. I would then get the file

2   ready, schedule the pick up, and then reply back to overseas office or local vendor and

3   let them know that the shipment has been set up and then give them a tracking

4   number. I would then make sure that the on-hand receipt was in the file. I would then

5   turn the file over to night operations to process the file.

6          6.      I have never held the title of "Freight Forwarder," nor am I aware

7   of any other employee within the Company who has.

8          7.      I currently work at the Company's CEVA LAX facility located at

9   19600 Western Ave., Torrance, California 90501, from Monday through Friday. My

10  shift typically starts at 8:00 a.m. and ends at 5:00 p.m. My schedule has been the

11  same for at least the last four (4) years.

12         8.      Recently, in March 2010, the "Import Team," which includes the

13  entry writers, the brokerage team and the dispatchers, began rotating working one

14  Saturday and one Sunday each month. When I am scheduled to work a Saturday shift,

15  my workweek changes to Tuesday through Saturday from 8:00 a.m. to 5:00 p.m.

16  When I am scheduled to work a Sunday shift, my workweek changes to Sunday

17  through Thursday from 8:00 a.m. to 5:00 p.m.

18         9.      My current supervisor is Lue Ann Liedlich. Ms. Liedlich has been

19  by supervisor since September 2009. Prior to Ms. Liedlich, Loretta Atuatasi was my

20  supervisor. Ms. Atuatasi served as my supervisor from approximately 2004 until

21  September 2009. Prior to Ms. Atuatasi, Jose Africa was my supervisor. Mr. Africa

22  served as my supervisor from approximately 2000 until I was placed under Ms.

23  Atuatasi's supervision.

24         10.     When I was hired by the Company, I received an Employee

25  Handbook ("handbook"). I also receive a new handbook every year and must execute

26  a handbook acknowledgement form when I receive my new handbook.

27

28

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067-3107

2.

DECLARATION

11. The handbook contains the Company's various policies. These policies can also be found on the Company's intranet website. After I receive the handbook, I generally skim and review the various policies contained in it.

12. Based on my review of the handbook and based on trainings and information shared with me throughout my employment with the Company, I am familiar with the Company's meal period and rest break policies and time recording policies.

13. With regard to meal periods, I have understood throughout my employment with the Company, and before, that I have been permitted to take an unpaid meal period of at least 30 minutes during each of my shifts.

14. During my employment with the Company I always take my unpaid meal period within the first five hours of arriving to work. I have never missed a meal period. My meal period typically lasts an hour and have never been less than 30 minutes.

15. I typically eat my lunch in the lunch room provided by the Company. I usually bring my lunch, however vending machines with sandwiches, burritos, etc., are located in the lunch room. On occasion, I take my meal period off-site. On these occasions I usually go with friends to a local restaurant, such as The Mill located down the street on Western Ave., or I run an errand.

16. On occasion, I have asked my supervisors whether I may skip my meal period to keep working so I could leave early. My supervisors always denied my request, and reminded me that I must take my meal period within the first five hours of arriving at work. In fact, Ms. Atuatasi would walk around to her team, including me, and remind us, and ensure, that we take our meal periods within the first five hours of arriving at work.

17. At no time was I ever told by any of my supervisors, or anyone else at the Company, that I could not take a meal period.

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067 3107

3.

DECLARATION

18.   Based on my review of the handbook, and other training and communications I received during my employment, I also understood that I was permitted to a paid rest break of 15 minutes for each four (4) hours worked.

19.   During my employment with the Company I almost always take my rest break. I typically take my first rest break approximately 2 hours after arriving at work. I typically take my second rest break two hours after my meal period.

20.   Very rarely, I chose not to take my rest breaks because I want to finish my assignment or I forgot to or I lost track of time. However, on these very rare occasions, had I wanted to, or remembered, I could have taken a rest break. On these rare occasions I did not take a rest break, it was my own personal choice.

21.   At no time during my employment with the Company was I ever told by any of my supervisors, or anyone else at the Company, that I could not take the rest breaks permitted me by the Company.

22.   During my employment with the Company, I have understood that I am required to accurately record the start and end of my workday by punching in-and-out on the computer assigned to me. I am also required to accurately record when I take my meal period by again punching in-and-out on the computer assigned to me. I also understand that "off-the-clock" work is strictly prohibited (i.e., work without reporting any time worked on my time records).

23.   There have, however, been occasions when I forgot to punch in-or-out. When this has happened, I usually prepare a missed punch slip and I submit to my supervisor. My supervisor then approves the missed punch slip. My supervisor has never refused to correct my time punches and the Company has never refused to compensate me for all of the hours I worked.

24.   Additionally, I routinely review my time records for each pay period to ensure they are accurate. In fact, I review my hours everyday before leaving work. To my knowledge, I have never located any error in my time records.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2049 Century Park East
5th Floor
Los Angeles, CA 90067-3107

4.

DECLARATION

1        25.     The Company has always paid me accurately for the all the time I

2 worked.

3        26.     I have on occasion worked overtime while employed by the

4 Company.

5        27.     Whether and when I work overtime was determined entirely by my

6 workload on a given day, by the particular account I was working on and any

7 particular exigent circumstances or other time requirements, by which shift I worked.

8        28.     The Company's policy is that, if possible, that I male my request

9 to work overtime approximately two hours before the end of my shift. My supervisor

10 will either approve or deny my request. It is my understanding that my request is only

11 denied when there is sufficient coverage by other employees to complete my

12 assignment.

13        29.     I have on occasion requested and been granted to work overtime

14 approximately 15 – 20 minutes before my shift. I assumed I was able to complete an

15 assignment before the end of my shift, but I then realized able to do so. I would

16 inform my supervisors of the same, and they would always approve my overtime

17 request, again, unless there was coverage by another employee.

18        30.     The Company has always paid me accurately for any overtime I

19 worked.

20

21

22

23

24

25

26

27

28

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067 3107

5.

DECLARATION

Case 2:09-cv-04957-CAS-SS   Document 44-1   Filed 05/20/11   Page 103 of 115   Page ID
#:1811
Case 2:09-cv-04957-CAS-RC   Document 24-2   Filed 07/26/10   Page 95 of 100   Page ID
#:1040

31.     I have provided this declaration voluntarily.  I was not promised any benefit, nor threatened in any way, in exchange for the testimony I have provided in this declaration.   Prior to signing this declaration, I was provided with a full opportunity to carefully review this declaration and freely make any corrections and additions of any kind.  I verify that the information I have provided in this declaration is true and correct.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed this _1st_ day of _July_, 2010, at _Torrance_, California.

Maryester Balo

Firmwide:96174449.1 057554.1008

6.

DECLARATION

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2049 Century Park East
5th Floor
Los Angeles, CA  90067 3107

# DECLARATION OF ERIC CASILLAS

# DECLARATION OF ERIC CASILLAS

I, ERIC CASILLAS, do hereby swear, affirm and attest as follows, based upon my personal knowledge of the matters contained herein:

1.    I am over 18 years of age and competent to testify to the matters stated in this declaration. I make this declaration based upon my personal knowledge.

2.    I am currently employed by CEVA Freight, LLC ("the Company") as a Export Specialist II in Carson, California. I have been an employee of the Company or its predecessor entities for approximately 3 years. I worked in the Torrance facility for about two and a half years years, before shifting to the Carson branch a few months ago.

3.    As an Export Specialist II, my duties included customer service, data entry and airline bookings, which are used for sending freight to the airlines.

4.    I currently work at the Company's Carson facility located at 18120 Bishop Avenue, Carson, CA 90746. I work Tuesday through Saturday. Tuesday through Thursday, I work from 8:30 in the morning to 5:30 in the afternoon. Fridays I work from 10 a.m. to 7 p.m. Finally, on Saturdays I work from 7 in the morning to 4 in the afternoon. Most Saturdays I ask my supervisor, Loretta Atuatasi, if I can come in early so I can enjoy the rest of my Saturday. She generally gives me permission.

5.    When I come in early on Saturdays, I always clock-in whenever I begin work. I have never been asked to work off the clock or begin work and clock in later, when my shift is scheduled to start.

6.    My current supervisor is Loretta Atuatasi. Before Loretta, my supervisor was Kyle Munson.

7.    When I was hired by the Company, I received an Employee Handbook ("handbook") from the Human Resources department in Torrance. The handbook contained the Company's various policies. These policies can also be found on the Company's intranet website.

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2049 Century Park East
5th Floor
Los Angeles, CA 90067-3107

1.

DECLARATION

8.    Based on my review of the handbook and based on trainings and information shared with me throughout my employment with the Company, I am familiar with the Company's meal period and rest break policies and policies regarding accurately recording my time.

9.    With regard to meal periods, I have understood throughout my employment that I have been permitted to take an unpaid meal period of at least 30 minutes during each of my shifts.

10.    During my employment with the Company I have always taken my unpaid meal period. When I take my lunch break depends on when I arrive to work, but I generally take it between noon and 1:30 p.m. I either go get Filipino food or Subway or whatever else is around. Sometimes, I go to the Carson mall, Carl's Jr. or Lucky Star for lunch. From time to time, I eat with my teammates or with the Gateway department, but sometimes I eat by myself. I rarely bring a bagged lunch to work.

11.    I generally take a full hour for my lunch on weekdays, but on Saturdays, I may take a half an hour so I can leave earlier. I ask my supervisor, Loretta, for permission to take a 30 minute lunch, which she usually grants.

12.    I have never not taken a meal period for any reason. No supervisor has ever asked me to work through my meal period or skip my meal period. At no time was I ever told by any of my supervisors, or anyone else at the Company, that I could not take a meal period.

13.    Based on my review of the handbook and other training and communications I received during my employment, I also understand that I am permitted to a paid rest break of fifteen minutes for each four hours worked.

14.    During my employment with the Company I have always taken my 15 minute rest periods. My first rest break I generally take within the first two to two and a half hours of my shift. I will get up and take a walk around the parking lot to stretch my legs before coming back to work. Sometimes I go to the vending machines

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2049 Century Park East
5th Floor
Los Angeles, CA  90067 3107

DECLARATION

1    for my rest break to get a Monster energy drink. I generally take my second rest break

2    around 3:30 p.m. or 4:00 p.m. and hang out in the break room because it is too hot in

3    the parking lot by that time of day.

4           15.    At no time during my employment with the Company was I ever

5    told by any of my supervisors, or anyone else at the Company, that I could not take

6    my rest breaks.

7           16.    During my employment with the Company, I have understood that

8    I am required to accurately record the start and end of my workday. I use Worldport

9    to track my time; I have never heard of Kronos. After I log into my computer using

10   my username and password, I use my Worldport username and password to access the

11   Worldport system. I then type in "clock" to see my clock, which tracks when I work.

12   Then I type in my employee identification number to punch in and out of my shift.

13          17.    I am also required to accurately record when I take my meal

14   period by punching in and out of Worldport. I also understand that "off-the-clock"

15   work is strictly prohibited (i.e., work without reporting any time worked on my time

16   records).

17          18.    Once, I forgot to clock back in from lunch because it slipped my

18   mind completely.  To correct the error, I filled out a missed punch slip with a

19   screenshot of the hours on the system. Mr. Munson signed the form and sent it to the

20   Torrance office for payroll and they fix the error. I was paid for my time spent

21   working. My manager has never refused to correct my time punches or to compensate

22   me for all of the hours I worked.

23          19.    Other than this onetime accident, I have never worked off the

24   clock.  I have never and would never clock out of the system and then do work.

25   Additionally, I have never seen other employees working off-the-clock.

26          20.    Additionally, I review my time records every two months and I

27   have never located any error. Employees are told to regularly and consistently check

28   our "F-10" on Worldport and make sure our time is accurate.  My paycheck is

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2049 Century Park East
5th Floor
Los Angeles, CA. 90067 3107

3.

DECLARATION

1  generally consistent and when I have worked overtime, this payment has been

2  reflected in my paycheck.

3      21.    The Company has always paid me accurately for the all the time  I

4  worked.  The Company has also always paid me accurately for any overtime I worked.

5      22.    I have on occasion worked overtime while employed by the

6  Company.  Whether and when I work overtime was determined entirely by my

7  workload on a given day.  When the Company has a lot of work to be done, I gauge

8  my workload and ask my supervisor if I can do overtime.

9      23.    As part of my job as an Export Specialist II, I enter shipping

10 transactions on the Company's computer systems, such as Worldport and Class.  I am

11 informed that some of these electronic transaction records suggest that someone with

12 my user identification entered transactions during hours when I was not punched in on

13 CEVA's timekeeping system.  I also understand that some of these transactions were

14 input during what appears to be time when I was not working.

15     24.    I believe, however, that at times the records may be misleading.

16 For example, in September 2010, I worked a swing shift, so I worked through

17 midnight and into the next day.  However, the records show that I started my day at

18 exactly midnight, when in reality, midnight is right around my lunch hour.  Thus, the

19 system automatically checks me in for the day at midnight, though I have been

20 working for a few hours at this point.  Thus, the record may show a transaction taking

21 place at 11:15 p.m., which makes sense as I was indeed working during this time.

22     25.    During my employment with CEVA, I have not worked while off

23 the clock.

24

25

26 //

27 //

28 //

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067 3107

4.

DECLARATION

26.     I have provided this declaration voluntarily.  I was not promised any benefit, nor threatened in any way, in exchange for the testimony I have provided in this declaration.   Prior to signing this declaration, I was provided with a full opportunity to carefully review this declaration and freely make any corrections and additions of any kind.  I verify that the information I have provided in this declaration is true and correct.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed this ___ day of _____, 2010, at Carson, California.

ERIC CASILLAS

C:\Documents and Settings\pshroff\Desktop\CEVA Secondary Blitz Declaration Template.doc

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067 3107

5.

DECLARATION

# DECLARATION OF WENDY CEBALLOS

## DECLARATION OF WENDY CEBALLOS

I, Wendy Ceballos, do hereby swear, affirm and attest as follows, based upon my personal knowledge of the matters contained herein:

1.     I am over 18 years of age and competent to testify to the matters stated in this declaration. I make this declaration based upon my personal knowledge.

2.     I am currently employed by CEVA Freight, LLC ("the Company") as a Logistics Project Lead in Torrance, California. I have been an employee of the Company or its predecessor entities for approximately four (4) years. From approximately 2007 to 2009 I held the position of Logistics Specialist II/Lean Agent. In 2010, the Company promoted me to my current position.

3.     In my four (4) years with the Company, I have never heard nor met anyone with the title of "freight forwarder" working with or for the Company. To my understanding "Freight Forwarding" describes, in very general terms, our business.

4.     My duties as Logistics Projects Lead and Logistics Specialist varied from one another. Currently, I head the account for Creative Labs. I also oversee five (5) other employees: two (2) Customer Support Representatives, and three (3) Order Pickers. In Comparison, when I worked as a Logistics Specialist, I did not supervise any other employees and worked on the Hit Entertainment account.

5.     I currently work at the Company's LAX or Torrance facility located at 19600 Western Ave., Torrance, California 90501. From approximately 2008 to 2009 I worked out of our facility located in Rancho Dominguez, California.

6.     My current work schedule is Monday through Friday from 8:30 a.m. until 5:00 p.m. However, my schedule will change soon to 9:00 a.m. to 6:00 p.m. Throughout the course of my employment, my schedule has changed several times based on the projects I have worked on. My schedule changes have been in response to meet the needs of my customers.

TLER MENDELSON
ROFESSIONAL CORPORATION
049 Century Park East
5th Floor
Angeles, CA  90067.3107

1.

DECLARATION OF WENDY CEBALLOS

7. My current supervisor is Joe Sandi and my current manager is Junaid Sultan. Mr. Sandi and Mr. Sultan have been my supervisor and manager throughout the course of my employment with the Company.

8. When I was hired by the Company, I received an Employee Handbook ("handbook"). The handbook contained the Company's various policies. These policies can also be found on the Company's intranet website. After I received the handbook, I reviewed the various policies contained in it.

9. Based on my review of the handbook and based on trainings and information shared with me throughout my employment with the Company, I am familiar with the Company's meal period and rest break policies and policies regarding accurately recording my time.

10. With regard to meal periods, I have understood throughout my employment that I have been permitted to take an unpaid meal period of at least 60 minutes during each of my shifts.

11. During my employment with the Company I have almost always taken my unpaid meal period within the first five hours of arriving at work. I typically eat my lunch offsite. For example, today, I am going to a local fish grill with some of my co-workers. Sometimes, I eat offsite alone at a local restaurant. When I eat alone, I usually bring a book with me to help pass the time. I always take my full hour for lunch, however.

12. Although I always take my one hour meal period, I sometimes have forgotten to clock-out when I leave, or clock-in when I return from lunch. On these occasions, I submit a missed time slip authorization form and my time record is adjusted accordingly.

13. At no time was I ever told by my manager, or anyone else at the Company, that I could not take a meal period. I have also never heard any other employee be told that they could not take his or her meal period. No other employee

TTLER MENDELSON
Professional Corporation
2049 Century Park East
5th Floor
s Angeles, CA  90057.3107

2.

DECLARATION OF WENDY CEBALLOS

1    has ever told me that her or she could not take a meal period or been prevented from
2    taking one.

3         14.    Based on my review of the handbook and other training and
4    communications I received during my employment, I also understood that I was
5    permitted to a paid rest break of 10 minutes for each four hours worked.

6         15.    During my employment with the Company I have almost always
7    taken my rest periods. I usually take my first rest period before lunch and my second
8    rest period after.  When I take my rest period I usually go the Company lounge area
9    and socialize with other employees or speak on my mobile phone. My rest periods are
10   always at least 10 minutes.

11        16.    Rarely, I chose not to take my rest breaks because I want to finish
12   some work or attend to matter. However, when I do not take a rest period, it is my
13   personal choice and I could have taken one if I wanted to.

14        17.    At no time during my employment with the Company was I ever
15   told by my manager, or anyone else at the Company, that I could not take the rest
16   breaks permitted me by the Company.  I have also never heard any other employee be
17   told that they could not take his or her rest break.  Also, no other employee has ever
18   told me that he or she could not take a rest break or been prevented from taking one.

19        18.    During my employment with the Company, I have understood that
20   I am required to accurately record the start and end of my workday on the Kronos time
21   keeping system.  I am also required to accurately record when I take my meal period
22   by punching out at the beginning of my meal period and clocking back in after.  I also
23   understand that "off-the-clock" work is strictly prohibited (i.e., work without reporting
24   any time worked on my time records).

25        19.    There have, however, been occasions when I forgot to clock-out or
26   clock back in, as mentioned above. When this happened, I submit a missed punch slip
27   to my manager, Mr. Sultan, and he approves the missed punch slip.  Mr. Sultan has

28

TTLER MENDELSON
PROFESSIONAL CORPORATION
2049 Century Park East
5th Floor
Los Angeles, CA 90067-3107

3.

DECLARATION OF WENDY CEBALLOS

1  never refused to correct my time punches and the Company has never refused to
2  compensate me for all of the hours I worked.

3        20.    Additionally, I routinely review my time records for each pay
4  period to ensure they are accurate. I have never located any error and the Company
5  has always paid me accurately for the all the time I worked.

6        21.    I have, on occasion, worked overtime while employed by the
7  Company. Whether and when I work overtime was determined entirely by my
8  workload on a given day, and by the particular account I was working on. The
9  Company has always paid me accurately for any overtime I worked.

10       22.    As part of my job as a Logistics Project Lead, I enter shipping
11  transactions on the Company's computer shipping systems. The shipping system I
12  currently use is called Softeon. In the past, I have also used WorldPort and UniCode.

13       23.    I am informed that some of these electronic transaction records
14  on these shipping systems suggest that someone with my user identification entered
15  transactions during hours when I was not punched in on Kronos. For example, I was
16  informed that on January 31, 2008, after I clocked out at 1:03 p.m. there was a
17  transaction on the Worldport shipping system with my user identification at 4:35 p.m.
18  To the best of my recollection, I strongly believe I was not at work at 4:35 p.m. and
19  did not enter this transaction. As I mentioned before, if I am working, I am always on
20  the clock.

21       24.    I do not know why exactly a transaction with my user
22  identification was entered when I was not at work. However, I believe that during that
23  time I was training another employee and had lent my user identification and
24  password to the trainee to use. I believe the trainee, and not I, entered the transaction
25  at 4:35 p.m. As far as I know, this is the only plausible explanation for a transaction
26  having occurred, with my user identification, outside of the time that I was clocked-in
27  for work.

28

'LER MENDELSON
OFESSIONAL CORPORATION
49 Century Park East
5th Floor
angeles, CA 90067 3107

4.

DECLARATION OF WENDY CEBALLOS

25.   I have provided this declaration voluntarily.  I was not promised any benefit, nor threatened in any way, in exchange for the testimony I have provided in this declaration.   Prior to signing this declaration, I was provided with a full opportunity to carefully review this declaration and freely make any corrections and additions of any kind.  I verify that the information I have provided in this declaration is true and correct.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed this 29 day of April , 2011, at Torrance, California.

WENDY CEBALLOS

DECLARATION OF WENDY CEBALLOS